UNITED STATES ex rel. LEE KUM HOY et al. v. SHAUGHNESSY.

United States District Court
S. D. New York.
Sept. 17, 1953.

Hong & Gim, New York City, Benny Gim, New York City, of counsel, for relators.

J. Edward Lumbard, U. S. Atty., New York City, Harold R. Tyler, Jr., Asst. U. S. Atty., Max Blau, Attorney, Immigration and Naturalization Service, New York City, of counsel, for respondent.

DIMOCK, District Judge.

The three relators in this habeas corpus proceeding are natives of China who claim United States citizenship by virtue of the United States citizenship of the man whom they allege to be their father. They have been excluded from entry on the ground that this relationship has not been proved. They raise, among others, the point that they were denied due process in the introduction and use of reports of blood grouping tests in the proceedings resulting in their exclusion. The reports upon which the Board of Special Inquiry acted in excluding relators and upon which the Board of Immigration Appeals acted in dismissing their appeal were said by those authorities to demonstrate that appellants Lee Kum Hoy and Lee Moon Wah could not have been the children of their alleged father Lee Ha and his wife, Wong Tew Hee.[1] The ground which the authorities took as to the third relator, Lee Kum Cherk, was that, by testifying that the others were his brother and sister he had forfeited any right to have his story as to his own paternity believed.

The alleged parents and the three relators testified to their relationship before the Board of Special Inquiry and that Board made a formal finding that the testimony of all five had been reasonably harmonious and reasonably consistent with the records of the Immigration and Naturalization Service. Nevertheless the Board held the relators inadmissible on the basis of the blood grouping test reports which were said to exclude the possibility of the claimed parentage of two of them and to impeach the credibility of the third.

The Board of Immigation Appeals in a careful opinion cited a prior declaration that it would consider the results of blood grouping tests as conclusive if the tests had been properly conducted and that a showing of incompatability of blood type conclusively established nonpaternity. The Board therefore dismissed relators' appeal.

I am thus presented with a case where everything but the reports of blood grouping tests of two of the relators indicates that they are the children of an identified American citizen and his wife but where the reports have been given conclusive effect to the contrary

To begin with I must ascertain whether or not relators may raise in this habeas corpus proceeding the question whether they were accorded due process in the proceedings leading up to their exclusion.

Relators say that they are not only entitled to due process in these habeas corpus proceedings but are entitled to a judicial determination as to their citizenship in them. Relators would be clearly right if the administrative proceedings had been for deportation rather than exclusion. Kessler v. Strecker, 307 U.S. 22, 35, 59 S.Ct. 694, 83 L.Ed. 1082. As to exclusion proceedings, however, it was held in United States ex rel. Chu Leung v. Shaughnessy, 2 Cir., 176 F.2d 249, that the excluded alien was limited in habeas corpus to review of the fairness of the hearing and the correctness of the rules of law applied. Relators

---

1. Also variously referred to in the proceedings as Tew Hee Wong and Hee Tew Wong.

point out that the Court of Appeals in that case justified the denial of the right to a judicial determination of citizenship in habeas corpus on the ground that a separate special proceeding was available for that purpose. Relators say that the Immigration and Nationality Act of 1952 [8 U.S.C.A. § 1101 et seq.] has withheld that proceeding from them and that the ground has thus been cut from under the holding that persons in their situation may not have a judicial determination of citizenship in habeas corpus.

I need not, however, decide that point. Relators were given a hearing pursuant to 8 U.S.C. § 153 and, under the authority of Kwock Jan Fat v. White, 253 U.S. 454, 40 S.Ct. 566, 64 L.Ed. 1010, were entitled to due process of law. Under the circumstances of this case relators were not accorded that protection.

Lee Ha, the alleged father, was admitted to this country in 1926 as the son of a native born citizen. He had married Wong Tew Hee, his present wife, prior to leaving China. He claims that one son was born to them before he came to this country. The son is said to have gone into the Chinese army and not to have been heard from in thirteen years. The alleged father returned to China in 1929. He says that twin sons were born to his wife on September 8, 1930, and that one of these is the relator Lee Kum Hoy and the other is named Lee Kum Ark. The alleged father returned to this country in 1930 after the birth of the twin sons but went back to China, leaving the United States on June 25, 1938. He says that a son, relator Lee Kum Cherk, was born to his wife on May 19, 1939, and that a daughter, relator Lee Moon Wah, was born to her on June 20, 1940. The alleged father had returned to the United States after the birth of Lee Kum Cherk, arriving on October 30, 1939, and bringing with him one of the twin sons, Lee Kum Ark. In 1949 the alleged mother, Wong Tew Hee, came to this country. All of the immigration records made at the times of these various entries and departures are consistent with the family history as above recited.

The relators, two boys and a girl, aged respectively twenty-one, thirteen and twelve, arrived in New York by air on June 17, 1952. They and their alleged parents were examined before the Board of Special Inquiry with great particularity as to their village in China, their dwelling house, various family celebrations, their neighbors, their relations and even the hour of the day that their mother left in 1949, and who accompanied her to catch the bus. The answers of all were substantially consistent and gave no indication that they were the result of coaching.

The examination was adjourned for the purpose of taking blood grouping tests.

Upon resumption, the Government marked in evidence two sets of five cards each. The cards were Standard Form 514b, promulgated 1948 in the case of three of the cards and revised 1951 in the case of the rest. Each bore the designation "Hematology". The cards bearing the names of the three relators in the first set were signed with an indecipherable monogram which looks like D.S. and all the rest of the cards in both sets were signed with another indecipherable monogram which looks like N.Y. In each case the signatures were over a line under which was printed "(Report Made by ——— Initials.)". In the first set the cards bearing the names of the relators had no notation on a line subscribed "Name of Hospital or Other Medical Facility" but all the rest in both sets bore in this space the words "U.S. Public Health Service Hospital, Staten Island 4, N. Y."

The forms were divided into two columns, respectively headed "Check Exam. Requested" and "Results". The lines designated "Blood Type" and "Rh Factor" on the 1948 form and "Blood Group" and "Rh Type" on the 1951 form were checked on some of the cards and there were notations on all of the

lines so designated under the word "Results". On the cards of the three relators in the first set there were additional notations on a line with no designation and placed below the line designated "Rh Factor".

In tabular form the information was as follows:

First Set

| Name | Date of Report | Ck. Exam. Reqtd. | Results | Signature |
|------|------|------|------|------|
| Lee Kum Hoy | 7/ 1/52 | Blood Type | B | D.S [?] |
|  |  | Rh Factor | + |  |
|  |  | [Undesignated line] | MN |  |
| Lee Kum Cherk | 7/ 1/52 | Blood Type | O | D.S [?] |
|  |  | Rh Factor | + |  |
|  |  | [Undesignated line] | N |  |
| Lee Moon Wah | 7/ 1/52 | Blood Type | B | D.S [?] |
|  |  | Rh Factor | + |  |
|  |  | [Undesignated line] | MN |  |
| Lee Ha | 7/18/52 | Blood Group | A | N.Y. [?] |
|  |  | Rh Type | +M |  |
|  |  | [Undesignated line] | [none] |  |
| Wong Tew Hee | 7/18/52 | Blood Group | A | N.Y. [?] |
|  |  | Rh Type | +M |  |
|  |  | [Undesignated line] | [none] |  |

Second Set

| Name | Date of Report | Ck. Exam. Reqtd. | Results | Signature |
|------|------|------|------|------|
| Lee Kum Hoy | 8/12/52 | Blood Group | B | N.Y. [?] |
|  |  | Rh Type | +M |  |
|  |  | [Undesignated line] | [none] |  |
| Lee Kum Cherk | 8/12/52 | Blood Group | O | N.Y. [?] |
|  |  | Rh Type | +N |  |
|  |  | [Undesignated line] | [none] |  |
| Lee Moon Wah | 8/12/52 | Blood Group | B [2] | N.Y. [?] |
|  |  | Rh Type | +MN |  |
|  |  | [Undesignated line] | [none] |  |
| Lee Ha | 8/14/52 | Blood Group | A | N.Y. [?] |
|  |  | Rh Type | MN |  |
|  |  | [Undesignated line] | [none] |  |
| Wong Tew Hee | 8/14/52 | Blood Group | A | N.Y. [?] |
|  |  | Rh Type | MN |  |
|  |  | [Undesignated line] | [none] |  |

2. Followed by an indecipherable sign which may have been inadvertent.

The examining inspector summarized the reports as follows:

### First Set

| | | | | | |
|---|---|---|---|---|---|
| Lee Kum Hoy | Blood Type B | | Rh Factor | +MN |
| Lee Kum Cherk | " " O | | " " | +N |
| Lee Moon Wah | " " B | | " " | +MN |
| Lee Ha | Blood Group A | | Rh Type | +M |
| Wong Tew Hee | " " A | | " " | +M |

### Second Set

| | | | | | |
|---|---|---|---|---|---|
| Lee Kum Hoy | Blood Group B | | Rh Type | +M |
| Lee Kum Cherk | " " O | | " " | +N |
| Lee Moon Wah | " " B | | " " | +MN |
| Lee Ha | " " A | | " " | MN |
| Wong Tew Hee | " " A | | " " | MN |

Counsel for relators objected to the introduction of the reports in evidence.

The examining inspector announced to Wong Tew Hee, who was under examination at that particular time, that, according to the "A–B" test in both sets of reports, she and Lee Ha could not possibly be the parents of relators Lee Kum Hoy and Lee Moon Wah.

The examining inspector also put in evidence, among other things, a pamphlet copy of an article by Alexander S. Wiener, M.D., in the United States Law Review for December, 1936, which contained, among other things, a table indicating the impossibility of parents, each belonging to Blood Group A, having children belonging to Blood Group B, and a table indicating the impossibility of parents, each belonging to Blood Type M, having a child belonging to Blood Type N.

Counsel for relators excepted to the admission of the article in evidence and asked for the presence of Dr. Wiener and the doctor who made the blood tests for examination. His exception and request were rejected.

The examining inspector offered to permit counsel for relators to make an independent blood test by a doctor retained in behalf of the applicants "under the supervision of the United States Health Service with prior notice to the Immigration Service".

Counsel later withdrew his "request for an independent blood test" because he came to the conclusion that he should first cross-examine Dr. Wiener. At the time of the withdrawal, in response to a question by the examining inspector, relators said that no additional blood tests had been taken.

Dr. Wiener, in his article which was used by the examining inspector in evaluating the results of the tests, had occasion to discuss the claim that changes in the blood groups of an individual can occur. He said:

"The explanation of these observations is that they resulted from technical errors occurring when the tests were performed. Not one of these reports was written by an experienced investigator or by a recognized authority in the field. They are mentioned here only because they serve to emphasize that errors in technique can occur unless the tests are performed by a properly qualified individual. The tests for M and N are particularly of a delicate nature, so that considerable experience is necessary before one should be permitted to do the tests in medicolegal cases;

otherwise, errors may result which may serve to discredit the work or even cause a miscarriage of justice."

Relators' counsel in his excellent brief cites a report by the Committee on Medicolegal Problems of the Bureau of Legal Medicine and Legislation of the American Medical Association on Medicolegal Application of Blood Grouping Tests. 149 Journal of A.M.A. 699, June 14, 1952. Dr. Wiener was one of three members of that Committee.

With respect to the conclusiveness of the tests upon a court proceeding the committee says:

"While the results of the blood tests are admissible when they exclude paternity, the findings are not binding on the court. That is as it should be. It is the duty of the court to examine the evidence in order to convince itself that the tests have been properly carried out by qualified experts. When the court feels that adequate safeguards have not surrounded the tests, it should order the tests to be repeated by an independent expert, and there is nothing to prevent shipping of the blood to another part of the country if there is no other qualified expert in the state in which the case is being tried. In divorce and separation actions the court often takes into account other considerations, aside from the scientific results of the blood tests. To base decisions entirely on the results of the blood tests in such cases may harm an innocent third party by bastardizing the child. For this reason in a number of cases the court has refused to grant a divorce on the basis of the blood tests alone. In uncontested divorce actions, however, when the blood tests exclude paternity, the court has no choice but to grant the decree."

The Committee has this to say about the qualifications of experts:

"It hardly seems necessary to point out that it is essential that the person who undertakes to perform blood tests in medicolegal cases be a specialist in the field, that is, he should preferably be a person with an M.D. degree or with comparable academic training such as the possession of a Ph.D. degree, who has acquired extensive experience in the entire field of study of individual blood differences. In this connection, there is need for formation of a special panel of persons qualified to perform blood grouping tests in medicolegal cases of disputed parentage. In the meantime it is possible to distinguish most of the experts by the quality of their publications on the subject. The expert will have available at all times a large panel of persons of representative blood groups and types from whom he can obtain blood samples to serve as positive and negative controls for the various antibodies employed. The results of the control tests should be included in the final report. It is reprehensible to accept a case of disputed paternity and then purchase the necessary testing serums in order to obtain one's first experience with the delicate M–N and Rh–Hr tests with a problem of this nature. These tests have numerous pitfalls, and accurate results can be obtained only by specialists with regular and continuous experience with these tests. Moreover, the qualified expert must not only be a capable immunologist but also be well versed in genetics.

"The policy followed in New York City appears to be sound, and is also the least objectionable, since it does not interfere with the principle of free choice of physicians. After consultation with the New York Academy of Medicine, the Court of Special Sessions drew up a list of qualified experts available in the metropolitan area. When any party to an action requests the blood tests, his attorney is permitted to select any physician whose name is included on the list of experts. In addition to this precaution, whenever the blood tests exclude paternity, independent blood tests are carried out by another expert on the list."

The strong words of the Committee are obviously justified. An incorrect determination of nonpaternity in this case would not only separate children from

their parents but would bastardize legitimate children and unjustifiably tend to shake a husband's trust in his wife's fidelity. The common law, where a child has been born of a woman during wedlock, indulges in one of the strongest presumptions known to the law, the presumption that the child is that of her husband. Perhaps an administrative agency can disregard that rule of law without violating due process but it must, at least, give the parties the fullest opportunity to examine the accuracy of blood grouping tests on which a conclusion of nonpaternity is based.

■ That opportunity to test the accuracy of the blood grouping tests was denied relators here and I think that that denial was so serious as to infect the hearing with the degree of unfairness which amounts to a denial of due process of law. In effect, relators were confronted with pieces of paper purporting to give test results and yet were not afforded an opportunity to examine beyond the face of these pieces of paper before they were admitted in evidence. The reports of the blood tests put in evidence do not show who performed the tests. They only contain indecipherable monograms. Not knowing who performed the tests, relators were unable to examine into qualifications of the testers, a matter of considerable importance according to both of the articles referred to above. Likewise, relators had no opportunity to learn what techniques or procedures were employed in these tests which is also of no little importance. More than that they could not determine whether any danger of confusion or substitution of samples or testing serums existed during the handling of the samples and the making of the tests. Nevertheless, the reports were admitted. That is, blood test reports were accepted as evidence against relators although the circumstances by which they came into existence were enshrouded in mystery and then accuracy was clouded in doubt and uncertainty by the inconsistency between the two sets, if by nothing else. Relators were thus put to the task of somehow attempting to explain away evidence of a questionable character prepared for and supplied by the immigration officials. The net effect of this is that the immigration officials can arrange for blood tests and have at their disposal any information they desire concerning these tests. Yet, without making much more than the mere results available to relators, they can have such results admitted in evidence and leave relators completely in the dark concerning very important circumstances reflecting upon the accuracy of the tests or at best relegate relators to whatever information a diligent investigation might uncover in the short time during the conduct of the hearing. To my mind, it is unfair to admit such evidence under the circumstances and, it being evidence of such importance in this case, its prejudice to relators is plain.

Even had the two reports been consistent with each other and attested by the full signature of a physician skilled in the particular art, I think that due process would still have required that relators have an opportunity to cross-examine him. The reports in this case, however, cry out for cross-examination. Is there a close similarity between the MN and N types which would account for the transposition of those symbols in the first and second tests of three out of five of those tested? Is there a like similarity between the BO or A types which would make such mistakes likely in the "A–B" test? Is there any significance in the entering of the M–N symbols on the Rh line sometimes or is that an inadvertence? Is the omission of the + sign from the Rh line in two instances significant or is that an inadvertence? What, if any, is the significance of the change in terminology from "Blood Type" and "Rh Factor" to "Blood Group" and "Rh Type"? Is there any reason to believe that a third set of tests would not result in a still different conclusion?

■ Relators were denied due process, too in the imposition of the condition that their own tests must be made

under the supervision of the United States Public Health Service. Observation by that Service might be useful in making sure that there was no substitution or confusion of samples but supervision would probably result in tests which would perpetuate the errors, if any, made by the Service in its own tests.

Relators contend that it was also a denial of due process to admit Dr. Wiener's article in evidence without giving relators an opportunity to examine the author. The article was used as the source of the tables on which the examining inspector based his conclusions as to paternity. Relators point out that the article was published in 1936 and that, in 1952, Dr. Wiener, in conjunction with the two other members of the Committee on Medicolegal Problems of the Bureau of Legal Medicine and Legislation of the American Medical Association, published the report on Medicolegal Application of Blood Grouping Tests above referred to, 149 Journal of A.M.A. 699. The report emphasizes the progress that has been made since 1937 and adds, "Certain aspects of the subject are still controversial." While the report does not specifically cast doubt upon the universality of the application of the tables set forth in Dr Wiener's earlier article, it does reveal that the data used in reaching its conclusions were based upon experience with Caucasoids and Negroids. There are no data in the report as to the reactions of Mongoloids. The report also emphasizes the importance of the Rh–Hr tests about which nothing had been said in the prior article.

By examining Dr. Wiener relators hoped to demonstrate that the examining inspector's conclusions from the blood tests were faulty. They wished to test the validity for Mongoloids of Dr. Wiener's tables. They could have accomplished these purposes by calling Dr. Wiener on their own behalf after the tables had been introduced.

I cannot say that the introduction of the tables without producing Dr. Wiener for relators' cross-examination constituted a denial of due process. The infallibility of the blood test has been so far accepted that Justice Shientag, in a concurring opinion, said that the exclusion of paternity based on the test should, "assuming the tests to have been competently and accurately made, be accepted as conclusive by the trial court" and the per curiam opinion in the case indicated that the court was ready to take that view if evidence were adduced that it was "a scientifically established and accepted fact that an exclusory finding is conclusive as to nonpaternity". Commissioner of Welfare of City of N. Y. ex rel. Tyler v. Costonie, 277 App. Div. 90, 92, 91, 97 N.Y.S.2d 804, 806, 805. The Supreme Court of Maine has taken the same view as Justice Shientag. Jordan v. Mace, 144 Me. 351, 69 A.2d 670.

In the light of this judicial attitude it would be difficult to say that the action of the Board of Inquiry, in making use of the tables, was even erroneous, let alone a deprivation of due process. It was open to relators to present their own evidence as to any infirmity in the tables as applied to them. This they failed to do.

Relators, citing Quan Hing Sun v. White, 9 Cir., 254 F. 402, as condemning discrimination against Chinese in administering the law relating to the admission of children of citizens, charge that blood grouping tests are used by the Immigration and Nationalization Service only in cases involving Chinese. The Government denies this and says that they are used wherever birth records are not available. Relators counter with the claim of the existence of a letter from the Surgeon General to the Public Health Service which directs that blood tests be administered only to Chinese persons. I cannot pass upon the question of discrimination without knowing what the facts are. Since the relators must be released unless they are accorded a further hearing before the Board of Special Inquiry, the facts as to the actual practice of the Immigra-

tion Service can be developed, if it becomes necessary, upon the new hearing.

Relators make the unqualified statement that those who claim the right to enter as citizens cannot lawfully be required to submit ·to blood tests. I am not called upon to decide that question since there is here no sufficient evidence that the blood tests were required. Relators and their alleged parents voluntarily submitted and I cannot shut my eyes to the existence of the reports.

The writ will be sustained unless, within 20 days from the date of the order to be entered hereon, the hearing before the Board of Special Inquiry is reopened for proceedings in accordance with this opinion.

Settle order on notice.