**UNITED STATES of America ex rel. LEE KUM HOY, Lee Kum Cherk and Lee Moon Wah, Relators,**

v.

**Edward J. SHAUGHNESSY, District Director of Immigration and Naturalization Service, New \York District, Respondent.**

United States District Court
S. D. New York.
Aug. 8, 1955.

Hong & Gim, New York City, Benny Gim, New York City, of counsel, for Lee Kum Hoy and Lee Kum Cherk.

Edward J. Ennis, New York City, for Lee Moon Wah.

J. Edward Lumbard, U. S. Atty. for Southern District of New York, New York City, Harold J. Raby, Asst. U. S. Atty., New York City, of counsel, for respondent.

DIMOCK, District Judge.

Respondent has submitted a form of order dismissing a writ of habeas corpus. The writ was originally sued out to attack respondent's right to hold three children of the Chinese race born in China who had been excluded from the United States. They had claimed American citizenship by virtue of one Lee Ha whom they claimed as their father. The Board of Special Inquiry, largely on the basis of blood tests held to preclude paternity, rejected their claim and they were taken in custody pursuant to that determination. I held that relators had been wrongfully denied opportunities to attack the blood tests and directed that the writ should be sustained unless the hearings were reopened in order to afford relators those opportunities. United States ex rel. Lee Kum Hoy v. Shaughnessy, D.C., 115 F.Supp.

302. The hearings were reopened and relators were afforded the opportunities to which they were entitled. The Board of Special Inquiry reached the same result as it had on the earlier hearing and its determination was sustained by the Board of Immigration Appeals. Following the decision of the Board of Immigration Appeals respondent sought, before me, a dismissal of the writ. On that occasion, the second time that the matter was before me, relators claimed: first, that the mere requirement of a blood test was a denial of due process of law and, second, that blood tests were actually used only in cases of persons of the Chinese race and that this limitation of the use of the tests constituted such a discrimination as to deny these relators due process of law. I held that relators' first point was unfounded but that "[i]f the facts established a deliberate use of the blood test technique to exclude Chinese and admit others similarly qualified except for race, the discrimination would clearly be unconstitutional" and I stated that the writ would be sustained unless the hearing before the Board of Special Inquiry were reopened "for the purpose of (a) the introduction of evidence with respect to the requirement of blood grouping tests in the cases of persons of the Chinese race and the omission to require blood grouping tests under similar circumstances in the cases of persons of other races and (b) the determination, upon such evidence, of the issue of discrimination." United States ex rel. Lee Kum Hoy v. Shaughnessy, D.C., 123 F.Supp. 674, 678. Following the decision the hearings were reopened. Relators sought from me a direction that documents on the subject of discrimination be produced before the Special Inquiry Officer. I held it beyond my power to grant the application. United States ex rel. Lee Kum Hoy v. Shaughnessy, D.C., 16 F.R.D. 558. The Special Inquiry Officer found, as a fact, that "there was no discrimination at the time these applicants sought admission to the United States in 1952", and reached the same result as before. His determina-

tion was affirmed by the Board of Immigration Appeals. The case is now before me, for the third time, on respondent's application for an order dismissing the writ.

The issue of discrimination has been thrown into such bold relief in the case and relators have made such extraordinary efforts to get into the record all that the Government possessed on the subject, that I am justified in determining that issue upon that record.

■ It has become so clear that the policy of the Immigration Authorities is to apply blood tests to all Chinese and to no whites that even the presumption of administrative finality will not support a determination to the contrary. The Government has been unable to point to a single instance where a white person had been subjected to a blood test or a Chinese excused from one.

In July of 1953, when charges of racial discrimination against the Chinese in blood tests were first made in relators' application for a writ of habeas corpus, the government denied that Chinese were singled out for such tests and claimed that blood tests were required in all cases where there were no birth certificates or other documents of identity. Thus, in the Government brief, it was stated that blood tests were not imposed upon Chinese persons alone, but upon "all persons attempting to enter the United States without birth certificates and similar documents". Similar statements were contained in several subsequent government affidavits to the effect that blood tests were required only in those cases where there was an absence of birth certificates and other documentary evidence of identity.

In answering this argument of the government, relators cited two cases where Chinese persons were blood tested notwithstanding the fact that they had birth certificates. This was noted by me in my decision at 123 F.Supp. 674, 677, supra, where I said that these two cases lent substance to the claim that Chinese, regardless of the availability of birth certificates or other documents, were always subjected to a blood test while other persons never were.

In the reopened hearing following that decision, the Immigration Bureau witness sought to minimize the importance of birth certificates in determining whether a blood test was necessary, stating that it was "only one of the many criteria" for determining whether a blood test was needed in a particular case. According to the witness there are three common patterns of children of American citizens born abroad who apply for admittance to the United States as citizens. The first involves an American child in an "American colony" abroad, whose parents keep in close touch with the Consulate, and where the births and marriages would be registered at the Consulate. The second pattern, which, like the first, is not the usual pattern for Chinese children, would be where the American parent is not known to the Consulate, but where birth and marriage certificates are produced to substantiate the claim and, most important, the children involved are born in an area where the Consul could speedily conduct an investigation and ascertain from neighbors, friends and local government officials, the true identity of the child.

In the foregoing two patterns of cases, the witness stated "there would be no need for using blood test evidence to verify an obvious relationship". The third type of situation was one which he said was typical of Chinese. This was where the child was born in the remote interior of China, where no birth or marriage certificates were kept, and, most important of all, the claimed area of birth was inaccessible to the Consul and hence where he could not conduct any investigation as to the circumstances of the child's birth. The witness then concluded and reaffirmed on cross examination that the most important factor in determining whether a blood test would be required is whether a child is born in an area where the American Consul can readily conduct an investigation. He

said that, if the Consul could verify the identity of the child involved from his investigation, by talking to neighbors, friends and local officials, there would be no need for a blood test.

Although the witness testified that the most important criterion for determining the necessity of a blood test—namely, the ability of the consulate to investigate the area of a person's birth—had been a factor in immigration investigations which antedated by a long time the use of blood tests, he admitted that, in the government brief filed when this case was first argued, there was no mention at all of this "most important" criterion. Similarly, in the subsequent government affidavits filed prior to the issuance of my decision, the Immigration Service had stated specifically that blood tests were required in cases where there were no birth certificates or documentary evidence, and there was no mention whatsoever of the feasibility of a consular investigation as being determinative of whether blood tests were necessary.

To show that Chinese persons claiming a right to enter the country as children of United States citizens are always required to submit to blood tests, irrespective of how satisfactory their other proof as to identity was and regardless of whether they were born in an area where a consular investigation was possible, relators cited several cases as examples.

Exhibit No. 27 involved L-L the son of L-H, an American citizen of Chinese descent. L-L was born in Hong Kong, and produced a contemporaneous official birth certificate issued by the British government to prove his identity. This certificate stated the names of his parents and the place and date of his birth. In addition, the parents of L-L, having been married in Hong Kong, produced a marriage certificate. Most important, the son and mother were living in Hong Kong, and an investigation by the American Consul there was thoroughly feasible, and in fact conducted. Nevertheless, L-L, a child only a year and a half old at the time, was subjected to a blood test along with his father and mother.

Exhibit No. 28, involves Ng Ho Gim, an American citizen of Chinese descent, who petitioned for his six year old son who was living in Hong Kong with his mother. His son was born in Hong Kong and his birth was registered at the American Consulate which issued a certificate verifying the birth of the child and the marriage of the parents. Notwithstanding the American Consulate's own certificate acknowledging the identity of the child and the fact of his parents' marriage, and in spite of the fact that the child was living in Hong Kong, thus making a thorough investigation possible, a blood test was still demanded of the parents and the child.

Exhibit No. 29 involves a naturalized American citizen of Chinese descent who married a Chinese alien woman in Hong Kong who subsequently gave birth to a child there. In a petition to bring his son over, the citizen submitted a contemporaneous birth certificate issued by the British government for his son, and his marriage certificate, also issued by the British government. In addition, the son and wife were living in Hong Kong where an investigation was feasible. But most important there were prior records of the wife and son at the American Consulate and the Consul had been for a long time cognizant of the family relationship of the individuals. Nevertheless, a blood test was required of all the parties.

Exhibit No. 30 involves an American citizen of Chinese descent who married a Chinese alien in Hong Kong to whom a son was later born, also in Hong Kong. The citizen parent had a contemporaneous birth certificate issued by the British government for his son, and a contemporaneous marriage certificate for his marriage issued by the British government. In addition, the child being born and living in Hong Kong with his mother, the American Consul was able to conduct a thorough investigation. Nevertheless a blood test was required.

These instances of imposition of blood tests in the cases of Hong Kong born Chinese take this case out of the rule of Lue Chow Kon v. Brownell, 2 Cir., 220 F.2d 187, and United States ex rel. Dong Wing Ott v. Shaughnessy, 2 Cir., 220 F.2d 537, in each of which Judge Smith sustained a practice of subjecting to blood test all Chinese born in China, at pages 190 and 540 respectively, on the ground that that circumstance interposed great obstacles to investigation.

■ The worst that can be assumed is that these three Chinese children sought admittance to the United States upon a false claim of paternity. They made an affirmative showing of paternity that would have been sufficient but for the requirement that they submit to blood tests. They have been excluded. Members of the white race in exactly the same position are admitted. The Chinese and white persons thus differently treated constitute a single class but for their color. The Chinese of this class are excluded and the whites admitted. That constitutes a deliberate strict enforcement of the immigration laws in the case of Chinese and a deliberate loose one in the case of whites. As I stated in United States v. Shaughnessy, supra, 123 F.Supp. 674, at pages 677–678, such a practice violates the constitution. See, besides the cases there cited, Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873; Mar Gong v. Brownell, 9 Cir., 209 F.2d 448; Lau Hu Yuen v. United States, 9 Cir., 85 F.2d 327.

It is true that these relators were born in China and that the Kon and Ott cases hold that Chinese born in China may be lawfully excluded under a practice which requires blood tests of Chinese born in China and of no others. Have these relators, who could thus have been lawfully excluded if that had been the practice, standing to raise the question of the constitutionality of their exclusion where the practice was to require blood tests of all Chinese? I recognize that one who attacks a practice as unconstitutional must show that it is unconstitutional as

to him but that is exactly what relators have done here. They have shown that the practice excludes them where whites, in exactly the same circumstances, would have been admitted. The fact that they could have been lawfully excluded under a practice of requiring blood tests of all Chinese born in China and of no others is immaterial. That was not the practice under which they were excluded and which they are now attacking.

The imposition of blood tests in the cases of relators under the prevailing practice violated their constitutional rights to be free from discrimination. Except for the evidence in connection with blood tests the record would have entitled them to admission. Their writ of habeas corpus is sustained.