237 F.2d 307
 UNITED STATES of America ex rel. LEE KUM HOY, Lee Kum Cherk, and Lee Moon Wah, Relators-Appellees,
v.
Edward J. SHAUGHNESSY, District Director of the Immigration and Naturalization Service, Respondent-Appellant.
 No. 373.
 Docket 23972.
 United States Court of Appeals Second Circuit.
 Argued May 7, 8, 1956.
 Decided September 25, 1956.
 Writ of Certiorari Granted January 14, 1957.
 
 See 77 S.Ct. 355.
 Ben Gim, New York City, for relators Lee Kum Hoy and Lee Kum Cherk, appellees and cross-appellants.
 Edward J. Ennis, New York City, for relator Lee Moon Wah, appellee and cross-appellant, Clifford Forster, New York City, of counsel.
 Harold J. Raby, Asst. U. S. Atty., Southern Dist. of New York, New York City (Paul W. Williams, U. S. Atty., and Maurice N. Nessen, Asst. U. S. Atty., New York City, on the brief), for respondent-appellant and cross-appellee.
 Before CLARK, Chief Judge, and FRANK and HINCKS, Circuit Judges.
 HINCKS, Circuit Judge.
 
 
 1
 This is an appeal from an order in a habeas corpus proceeding in which the relators are three Chinese-born minors claiming admission to the United States as citizens by derivation from one Lee Ha, concededly an American citizen, alleged to be their father. The respondent is the District Director of the New York District of the Immigration and Naturalization Service.
 
 
 2
 The putative father, who sued out the writ, came to the United States as a derivative citizen in 1926. He returned to China for a visit in 1929 and again visited China in 1938 for a period of 16 months. The relators, it is claimed, were begotten during these periods; Lee Kum Hoy being born in 1930, Lee Kum Cherk in 1939, and Lee Moon Wah in 1940. In 1949 the wife came to this country, and in 1952 the relators arrived. Lee Ha testified that prior to their arrival he had sent from this country substantial contributions to the support of his children in China but was unable to furnish any documentary evidence of the transmission of such funds.
 
 
 3
 The original immigration hearing was held on August 14, 1952. The Board of Special Inquiry examined the relators and their parents with great particularity as to their village home in China, their dwelling house, various family celebrations, their neighbors and their relatives. The Board found that this testimony was "reasonably harmonious and reasonably consistent with the records of the Immigration and Naturalization Service."
 
 
 4
 Shortly prior to this hearing, two blood grouping tests of the entire family had been made. The results of the tests were put into evidence at the hearing and objected to by the relators. Although conflicting in some particulars, the data common to both tests established conclusively that Lee Ha could not be the father of two of the relators. Since the children all swore that they were brothers and sisters, the Board of Special Inquiry found that Lee Ha could not be their father and ordered all three excluded from the United States. The Board of Immigration Appeals supported the decision treating the blood tests as convincing evidence of non-paternity.
 
 
 5
 A writ of habeas corpus then issued followed by three successive hearings before the District Court. In the first of these the relators claimed that use of the blood test evidence deprived them of due process of law because they were not allowed to cross-examine the blood-test technician and because the tests were discriminatorily administered to all Chinese, and no whites. Judge Dimock held that the right to cross-examine the technicians had been improperly denied and, without passing on the claim of discrimination, remanded for rehearing before the Board of Special Inquiry, D.C., 115 F.Supp. 302. An adverse decision by the Immigration Service again brought the relators before Judge Dimock. This time he held that the blood test evidence had been properly received if the tests had been taken without undue discrimination but feeling that the evidence on the issue of discrimination was inconclusive he ordered another rehearing on that issue, D.C., 123 F.Supp. 674. After the Immigration authorities again ruled against the relators, Judge Dimock, in his third opinion, reported at D.C., 133 F.Supp. 850, found that the blood tests were administered to all Chinese and to no whites, and held that this was illegal discrimination. Accordingly, he sustained the writ and ordered the relators to be admitted as citizens of the United States.
 
 
 6
 From this order, the respondent appeals. The relators by their cross-appeal predicate error on Judge Dimock's ruling in his second decision that even without the sanction of statute or official, authorized, regulations the Immigration Service may make use of blood testing as a method of non-discriminatory investigative procedure.
 
 
 7
 At the administrative hearings evidence relative to the claim of anti-Chinese discrimination was developed as follows. When American Consulates in China were closed, the Consulate in Hong Kong was flooded with passport applications by those theretofore living in the interior of China. The State Department then began taking blood tests in Hong Kong as a check on claims of paternity. The results of the tests having there proved useful as an investigative device, the procedure was adopted on an informal basis by individual investigators of the Immigration Service in its examination of Chinese arrivals beginning at some time, not precisely identified, in 1952. Between June 1952 and November 1953, at the request of the Immigration Service, 200 Chinese were blood tested by the Health Service, pursuant to a Federal Security Agency circular authorizing it to test United States citizens of Chinese descent. The Immigration Service also referred Chinese claimants to private physicians to make blood tests, one of whom testified that between early 1952 and November 1953 he tested 300 Chinese and no whites. To refute the respondent's contention that such tests were required of Chinese only in cases in which a birth certificate and opportunity to make a local investigation of paternity were absent (as was generally true of those born and raised in the interior of China), the relators put in evidence proof of four cases of Hong Kong Chinese, who had birth certificates issued by the British government or the American Consulate in each of which blood tests had been requested. In three of these cases the request for blood tests was made between July 24, 1952 and June 2, 1954.
 
 
 8
 The first formal authority for the use of blood tests was contained in a precedent decision of the Board of Immigration Appeals handed down on February 25, 1953. The Immigration Service first promulgated instructions relating to blood tests in early 1953. The early instructions dealt only with visa petitions and certificates of citizenship: they did not directly or indirectly purport to apply to exclusion proceedings. While the early directives did mention the use of blood tests specifically in Chinese visa petition cases and applications for certificates of citizenship, those instructions at no time directed the use of blood tests exclusively in Chinese cases and at no time precluded the use of blood tests in non-Chinese cases.
 
 
 9
 More recently, some time in 1954, all of those instructions were rescinded and all current instructions concerning the investigation techniques with respect to cases wherein blood tests are deemed essential or necessary do not directly or indirectly refer to any racial or nationality group but predicate the requirement on the nature of the case and the issue of paternity or the relationship which is involved. No instruction of any kind as to Chinese or other persons has been issued with respect to exclusion hearings before Special Inquiry Officers.
 
 
 10
 The respondent, in an effort to show the blood testing of non-Chinese, pointed to four cases of testing in the 1952-1953 period but none of these were definitely identified as involving persons of non-Chinese extraction. The respondent offered as a witness an Attorney-Advisor in the office of District Counsel for the New York office of the Immigration and Naturalization Service who since 1941 had experience in the Service as a Naturalization Examiner and chief of the Status Section. Since 1946 he had been assigned to that office as Attorney-Advisor in which capacity he had had first-hand knowledge of all policy decisions and had participated in thousands of litigated cases, including cases involving evidence of citizenship involving Chinese persons. He testified that Chinese cases in the large fell within the general pattern described in Mar Gong v. McGranery, D.C. S.D.Cal., December 15, 1952, 109 F.Supp. 821,[1] and that a high incidence of fraud had been developed in the cases falling within that general pattern.[2] He testified further as follows. The Service had discovered that in bringing Chinese-born children to the United States there had developed a practice to prepare coaching books or "Halgoons" comprising an extensive written summary of family background reciting alleged details of family life, village, neighbors, schooling and local geography, which the alleged members of the family memorize and use as the basis for the answers to the questions asked of them severally, thus avoiding inconsistencies and concealing evidence of fraud which might otherwise develop on their respective examinations. The complicated structure of the Chinese calendar, the similarity of humble Chinese homes and villages as well as the Chinese language were unique factors which added to the difficulty of testing the credibility of witnesses in Chinese cases by separate examination as to the detail of significant family dates and abodes. This witness further testified:
 
 
 11
 "* * * As a matter of fact, it has been my experience that a substantial, if not the major proportion of all Chinese children arriving in the United States are admitted to the United States on primary inspection because no doubt exists as to their admissibility. But the large incidence of fraud in Chinese cases is known and is recognized, although the fraud in one of a thousand cases is never imputed to other cases, nonetheless, it does form a very substantial and very rational basis for being particularly cautious in examining and in investigating cases which fall into the same pattern as the Chinese cases which have been demonstrated to be fraudulent, so that the Government's interests will be protected and the Government will not be imposed upon by fraudulent claims."
 
 He testified further:
 
 12
 "For this reason, when the use of blood tests on such issues first came to the attention of the Immigration authorities, it was seized upon as one of the first genuinely, tangible methods of reaching the truth. It is the position of the Immigration Service that the use of blood tests under such circumstances is not discriminatory — but is necessary, by reason of the pattern and type of case! — and not because the persons involved happen to be of the Chinese race."
 
 
 13
 The respondent's witnesses categorically denied that racial discrimination in the use of blood tests had ever existed and attributed the number of Chinese tested in the 1952 period to a proper police motive on the part of individual investigators adequately to investigate cases which seemed suspicious against their current background, evaluated by the actual experience of those responsible for the enforcement of the applicable law. Their testimony showed that at a later period an increasing number of non-Chinese were blood tested.
 
 
 14
 We agree with the relators that this case is not governed by our former decisions in Lue Chow Kon v. Brownell, 2 Cir., 220 F.2d 187, and U. S. ex rel. Dong Wing Ott v. Shaughnessy, 2 Cir., 220 F.2d 537. The evidence of discrimination here is substantially more compelling than that before us in those cases. However, we do not recede from our holding in those cases that blood tests, if not taken because of discrimination on racial grounds, are competent evidence on the issue of paternity, at least in federal courts sitting in the State of New York. We overrule the relators' contention, raised by their cross-appeal, that evidence of the blood tests was improperly received because of lack of administrative authority to make use of blood tests. Even in the absence of express authority embodied in official rules or directives, we hold that in the situation here responsible official personnel had authority to utilize any non-discriminatory, investigatory technique reasonably appropriate. The ruling complained of is sustained and the order complained of by the cross-appeal is affirmed.
 
 
 15
 We hold further that on the entire administrative record, only the salient portions of which are set forth above, the finding below that the testing of these relators was actuated by racial discrimination, was not warranted. It is true that in the 1952-1953 period there was evidence of 500 actual cases in which Chinese had been tested and no evidence of blood testing in any non-Chinese case or of Chinese admitted without blood testing.[3] Nevertheless we think it more reasonable in the light of the administrative record, to attribute this apparent discrimination not to discrimination in fact but, rather, to the fact that in this early period the blood test technique first became known to investigators chiefly concerned with Chinese cases who were actuated to use it not because of racial prejudice but by a proper police motive for their aid in the solution of difficult cases. As the Special Inquiry Officer pointed out in his opinion, the technique of blood tests to check claims of paternity was a new procedure which originated in the American Consulate in Hong Kong whence it spread to the Immigration Service. We agree with him that discrimination did not result because in less than two years it was not immediately adopted in every case. We affirm substantially on the grounds stated in the last "decisions" of the Special Inquiry Office and the Board of Immigration Appeals, being satisfied that on the whole the administrative record supported the conclusion reached therein, viz., that discrimination had not been proved. Cf. Tulsidas v. Insular Collector, 262 U.S. 258, 43 S.Ct. 586, 67 L.Ed. 969; O'Connell ex rel. Kwong Han Foo v. Ward, 1 Cir., 126 F.2d 615.
 
 
 16
 Certainly, there was no evidence that in any other particular cases the particular investigating officer or Special Inquiry Officer involved was actuated by racial prejudice either in requesting blood tests or in processing the case without blood tests: so far as the direct evidence shows the scope of investigation in every case processed was adjusted to accord with doubts as to the bona fides of the applicant's claimed paternity and to the availability of local sources of information at the applicant's foreign residence. And even if, contrary to our view, occasional prejudice on the part of individual officers of the Service were deemed proved by inference arising from the preponderance of Chinese cases among those blood tested, it does not follow that the officers responsible for the policies of the Service had consciously, in 1952, adopted a discriminatory policy. Surely the policy-makers were not under duty to re-examine cases disposed of with or without administrative appeal, apparently on a factual basis, in a search for an undisclosed discriminatory motive on the part of the particular officers, or to keep elaborate and expensive statistics classifying each case for its race and nationality, and developing the particular reasons which had determined the scope of the investigation made by the individual investigators. The evidence showing that no such statistics were currently accumulated, warrants no inference to bolster the relators' case on the issue of discrimination. Rather, we think, it tends to betoken that in 1952 the Service was not even race-conscious in the formulation of its investigative policies. It also furnishes a reasonable explanation for the respondent's difficulty and occasional inconsistencies (too much stressed below) in attempting for purposes of the reopened hearing of October 28, 1954 to determine and synthesize into a general pattern the evanescent reasons on which individual officers had shaped the scope of numerous investigations made two years before.
 
 
 17
 In our judgment, the four cases of Hong Kong Chinese, earlier adverted to, of applicants who were blood tested although possessed of birth certificates issued by the American Consulate, are not enough to impugn the administrative conclusion. At most, those cases are of slight weight in showing the then existence of racial discrimination and certainly are not conclusive of discrimination against these relators.
 
 
 18
 The respondent's appeal is reversed with a direction to dismiss the writ. Affirmed on the cross appeal.
 
 
 
 Notes:
 
 
 [1]
 That case was reversed and remanded on appeal. Mar Gong v. Brownell, 9 Cir., 209 F.2d 448. However, the appellate decision held only that fraud in other cases was not a proper factor to consider in making a judicial finding as to the alleged citizenship involved in a particular case such as the case there at bar. The opinion didnot suggest that knowledge of frauds attempted in cases of a similar pattern might not be considered for its bearing on the scope of investigation appropriate in the particular case. Indeed, blood testing was involved in the Mar Gong case.
 
 
 [2]
 The administrative record, however, contained no evidence of the comparative incidence of fraud in Caucasian, or non-Chinese, cases involving the issue of paternity. It suggests at most, that only a small proportion of the non-Chinese cases fell within the range of the Chinese pattern described in 109 F.Supp. 821
 
 
 [3]
 After the entry of the order below, the respondent moved to reopen to permit additional evidence to be taken by the court. The motion was supported by an affidavit made by an Investigator of the Naturalization Service detailed to investigate cases involving possible frauds perpetrated by persons of the Chinese race in connection with their admission to the United States. His affidavit recited,inter alia, that an examination of cases in the New York office of the Service made at the request of respondent's counsel disclosed a list, appended as Exhibit A, of 60 cases, each identified by file number, of white persons who had been blood tested between January 10, 1955 and August 4, 1955, and another list, appended to his affidavit as Exhibit B, comprising 124 Chinese-born persons admitted between March 31, 1952 and June 2, 1952, of which 40 had not been blood tested.
 This motion for a reopening was denied without opinion or comment. We think it plain that the facts thus sought to include in the record, if established after proper cross-examination, would have had some substantial weight to refute the evidence indicative of racial discrimination. It is true that the blood testing of whites in 1955 does not fully demonstrate the absence of anti-Chinese discrimination in 1952. But even so it is a factor which would make it more reasonable to attribute the absence of blood testing for whites in 1952 to the administrative difficulty of immediately expanding a newly utilized investigating technique which happened to begin with Chinese-born entrants to cover entrants of all other national extractions. Perhaps the motion was denied because deemed untimely; perhaps because the judge below thought that the evidence proffered, even if received, would not alter his finding of discrimination. In view of our contemplated disposition of this appeal, we do not need to pass upon the propriety of that ruling.
 
 
 
 19
 FRANK, Circuit Judge (dissenting as to respondent's appeal).
 
 
 20
 I concur in the affirmance on relators' cross appeal. As to respondent's appeal, I dissent, for the reasons stated by Judge Dimock in his opinions reported in D.C., 123 F.Supp. 674[1] and D.C., 133 F.Supp. 850.[2] I shall not repeat in detail his statement of the evidence or his reasoning. I think the record amply justifies his conclusion, 133 F.Supp. at page 852, that, "It has become so clear that the policy of the Immigration Authorities is to apply blood tests to all Chinese and to no whites that even the presumption of administrative finality will not support a determination to the contrary. The Government has been unable to point to a single instance where a white person had been subjected to a blood test or a Chinese excused from one." Judge Dimock seems to me to show, unanswerably, that we have here an unconstitutional administration of a valid statute.[3]
 
 
 21
 He carefully pointed out how the government, in the several stages of the hearings before him, kept shifting its position in a way which warranted his distrust of its protestations of an absence of discrimination.[4] On the third administrative hearing (held pursuant to Judge Dimock's opinion reported in 123 Fed.Supp. 674) respondent introduced the testimony of an Attorney-Advisor in the New York office of the Service. This testimony was designed to rebut the strong case of discrimination theretofore made by relators. This witness narrated instances purporting to prove absence of discrimination, and added his impressions of the administrative practices. Relators were denied the opportunity to see the administrative records to which this witness had referred. The witness conceded, on cross-examination, that his testimony was inconsistent with statements previously made by him in the return to the writ of habeas corpus. I think his testimony, which my colleagues stress, was wholly insufficient to offset relators' proof of discrimination.[5]
 
 
 22
 The administrative decision, made in 1952, adverse to relators, rested solely on the blood test evidence. Judge Dimock found (I think correctly) that such blood tests were discriminatorily applied as against Chinese persons; that therefore that evidence was improperly received; and that, except for that evidence, the record entitled relators to admission. Accordingly, they should have been admitted in 1952. It is suggested that this conclusion is artificial and academic, for this reason: Since the time of the adverse administrative decision in 1952, blood tests have been applied without discrimination, so that, if there were now a new administrative hearing, new blood tests could be received properly and would prove that relators are not citizens. I cannot agree with this argument: On the record, as it stood when the adverse administrative decision was made in 1952, defendants should have been admitted at that time, and therefore we should deal with the case as if they had been.
 
 
 23
 At first glance, it might seem absurd that the blood test evidence should be disregarded, inasmuch as it demonstrates that relators are not citizens.[6] But such was the sort of result reached in the justly famous case of Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220. There the relator had been convicted of a violation of an ordinance, and the Supreme Court accepted that violation as a fact. Nevertheless, the Court held that relator must be released on a habeas corpus writ because the ordinance had been discriminatorily applied to Chinese alone. The Court said in 118 U.S. at pages 373-374, 6 S.Ct. at page 1073: "Though the law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution." See also, e. g., Norris v. Alabama, 294 U.S. 587, 589, 55 S.Ct. 579, 79 L.Ed. 1074; Smith v. Texas, 311 U.S. 128, 130-131, 61 S.Ct. 164, 85 L.Ed. 84; Patton v. Mississippi, 322 U.S. 463, 465-466, 68 S.Ct. 184, 92 L.Ed. 76.
 
 
 24
 It might be argued that the doctrine of Yick Wo v. Hopkins turns on the requirement of "equal protection of the laws" found in the 14th Amendment and that there is no like provision applicable to the federal government. But in Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 694, 98 L.Ed. 884, the Court said, "The Fifth Amendment, which is applicable in the District of Columbia, does not contain an equal protection clause as does the Fourteenth Amendment which applies only to the states. But the concepts of equal protection and due process, both stemming from our American ideal of fairness, are not mutually exclusive. The `equal protection of the laws' is a more explicit safeguard of prohibited unfairness than `due process of law,' and, therefore, we do not imply that the two are always interchangeable phrases. But, as this Court has recognized, discrimination may be so unjustifiable as to be violative of due process. Classifications based solely upon race must be scrutinized with particular care, since they are contrary to our traditions and hence constitutionally suspect."[7]
 
 
 
 Notes:
 
 
 [1]
 In 123 F.Supp. 674, 677-678, Judge Dimock said:
 "Relators allege deliberate use of the blood test technique to exclude Chinese and admit others similarly qualified except for race. This result is reached, they say, because the application of the blood tests to Chinese and not to others constitutes more stringent enforcement of the immigration laws against Chinese than against others. Chinese persons, they say, are always subjected to the rigorous inquisition of a blood test while others, no matter how inconclusive may be the other evidence, are never subjected to a blood test. If such a deliberate use of the blood test technique to exclude Chinese exists, the discrimination against Chinese is clear even though the result may be to allow the admission of unqualified non-Chinese rather than to prevent the admission of qualified Chinese. It makes no difference that the complaint of the Chinese is against a failure to go to the full extent of the law in the case of non-Chinese rather than against going beyond the law in the case of Chinese. A minority could be as effectively persecuted by enforcing a law against them alone as by acting against them without warrant of law. Racial discrimination is abhorrent to our institutions. Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220; Hirabayashi v. U. S., 320 U.S. 81, 100, 63 S.Ct. 1375, 87 L.Ed. 1774; Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693 [98 L. Ed. 884]."
 
 
 [2]
 In 133 F.Supp. 850, 854, Judge Dimock said:
 "The worst that can be assumed is that these three Chinese children sought admittance to the United States upon a false claim of paternity. They made an affirmative showing of paternity that would have been sufficient but for the requirement that they submit to blood tests. They have been excluded. Members of the white race in exactly the same position are admitted. The Chinese and white persons thus differently treated constitute a single class but for their color. The Chinese of this class are excluded and the whites admitted. That constitutes a deliberate strict enforcement of the immigration laws in the case of Chinese and a deliberate loose one in the case of whites. As I stated in U. S. [ex rel. Lee Kum Hoy] v. Shaughnessy, supra, 123 F.Supp. 674, at pages 677-678, such a practice violates the constitution. See, besides the cases there cited, Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S. Ct. 686, 98 L.Ed. 873; Mar Gong v. Brownell, 9 Cir., 209 F.2d 448; Lau Hu Yuen v. U. S., 9 Cir., 85 F.2d 327."
 
 
 [3]
 See, e. g., Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220
 
 
 [4]
 In 133 F.Supp. at pages 852-853, Judge Dimock said:
 "In July of 1953, when charges of racial discrimination against the Chinese in blood tests were first made in relators' application for a writ of habeas corpus, the government denied that Chinese were singled out for such tests and claimed that blood tests were required in all cases where there were no birth certificates or other documents of identity. Thus, in the Government brief, it was stated that blood tests were not imposed upon Chinese persons alone, but upon `all persons attempting to enter the United States without birth certificates and similar documents'. Similar statements were contained in several subsequent government affidavits to the effect that blood tests were required only in those cases where there was an absence of birth certificates and other documentary evidence of identity.
 "In answering this argument of the government, relators cited two cases where Chinese persons were blood tested notwithstanding the fact that they had birth certificates. This was noted by me in my decision at 123 F.Supp. 674, 677, supra, where I said that these two cases lent substance to the claim that Chinese, regardless of the availability of birth certificates or other documents, were always subjected to a blood test while other persons never were.
 "In the reopened hearing following that decision, the Immigration Bureau witness sought to minimize the importance of birth certificates in determining whether a blood test was necessary, stating that it was `only one of the many criteria' for determining whether a blood test was needed in a particular case. According to the witness there are three common patterns of children of American citizens born abroad who apply for admittance to the United States as citizens. The first involves an American child in an `American colony' abroad, whose parents keep in close touch with the Consulate, and where the births and marriages would be registered at the Consulate. The second pattern, which, like the first, is not the usual pattern for Chinese children, would be where the American parent is not known to the Consulate, but where birth and marriage certificates are produced to substantiate the claim and, most important, the children involved are born in an area where the Consul could speedily conduct an investigation and ascertain from neighbors, friends and local government officials, the true identity of the child.
 "In the foregoing two patterns of cases, the witness stated `there would be no need for using blood test evidence to verify an obvious relationship.' The third type of situation was one which he said was typical of Chinese. This was where the child was born in the remote interior of China, where no birth or marriage certificates were kept, and, most important of all, the claimed area of birth was inaccessible to the Consul and hence where he could not conduct any investigation as to the circumstances of the child's birth. The witness then concluded and reaffirmed on cross examination that the most important factor in determining whether a blood test would be required is whether a child is born in an area where the American Consul can readily conduct an investigation. He said that, if the Consul could verify the identity of the child involved from his investigation, by talking to neighbors, friends and local officials, there would be no need for a blood test.
 "Although the witness testified that the most important criterion for determining the necessity of a blood test — namely, the ability of the consulate to investigate the area of a person's birth — had been a factor in immigration investigations which antedated by a long time the use of blood tests, he admitted that, in the government brief filed when this case was first argued, there was no mention at all of this `most important' criterion. Similarly, in the subsequent government affidavits filed prior to the issuance of my decision, the Immigration Service had stated specifically that blood tests were required in cases where there were no birth certificates or documentary evidence, and there was no mention whatsoever of the feasibility of a consular investigation as being determinative of whether blood tests were necessary.
 "To show that Chinese persons claiming a right to enter the country as children of United States citizens are always required to submit to blood tests, irrespective of how satisfactory their other proof as to identity was and regardless of whether they were born in an area where a consular investigation was possible, relators cited several cases as examples.
 "Exhibit No. 27, involved L-L the son of L-H, an American citizen of Chinese descent. L-L was born in Hong Kong, and produced a contemporaneous official birth certificate issued by the British government to prove his identity. This certificate stated the names of his parents and the place and date of his birth. In addition, the parents of L-L, having been married in Hong Kong, produced a marriage certificate. Most important, the son and mother were living in Hong Kong, and an investigation by the American Consul there was thoroughly feasible, and in fact conducted. Nevertheless, L-L, a child only a year and a half old at the time, was subjected to a blood test along with his father and mother.
 "Exhibit No. 28, involves Ng Ho Gim, an American citizen of Chinese descent, who petitioned for his six year old son who was living in Hong Kong with his mother. His son was born in Hong Kong and his birth was registered at the American Consulate which issued a certificate verifying the birth of the child and the marriage of the parents. Notwithstanding the American Consulate's own certificate acknowledging the identity of the child and the fact of his parents' marriage, and in spite of the fact that the child was living in Hong Kong, thus making a thorough investigation possible, a blood test was still demanded of the parents and the child.
 "Exhibit No. 29 involves a naturalized American citizen of Chinese descent who married a Chinese alien woman in Hong Kong who subsequently gave birth to a child there. In a petition to bring his son over, the citizen submitted a contemporaneous birth certificate issued by the British government for his son, and his marriage certificate, also issued by the British government. In addition, the son and wife were living in Hong Kong where an investigation was feasible. But most important there were prior records of the wife and son at the American Consulate and the Consul had been for a long time cognizant of the family relationship of the individuals. Nevertheless, a blood test was required of all the parties.
 "Exhibit No. 30 involves an American citizen of Chinese descent who married a Chinese alien in Hong Kong to whom a son was later born, also in Hong Kong. The citizen parent had a contemporaneous birth certificate issued by the British government for his son, and a contemporaneous marriage certificate for his marriage issued by the British government. In addition, the child being born and living in Hong Kong with his mother, the American Consul was able to conduct a thorough investigation. Nevertheless a blood test was required."
 
 
 [5]
 See footnote 4
 
 
 [6]
 Cf. a case where a decision rests on evidence which indubitably proves a defendant's guilt, but has been obtained by an unlawful search and seizure
 
 
 [7]
 I think it would be improper to direct Judge Dimock now to take evidence as to relators' citizenship in ade novo judicial hearing. If relators had been residents of this country, and on their re-entry had asserted their American citizenship, I think they would have been entitled, on their demand, to such a judicial hearing de novo. See Chin Yow v. U. S., 208 U.S. 8, 28 S.Ct. 201, 52 L.Ed. 369; Cf. U. S. ex rel. Medeiros v. Watkins, 2 Cir., 166 F.2d 897, 900 (dissenting opinion); Shaughnessy v. U. S. ex rel. Mezei, 345 U.S. 206, 214-215, 73 S.Ct. 625, 97 L.Ed. 956. On the facts of this case, however, the sole function of Judge Dimock was to determine whether the administrative finding of lack of citizenship was supported by the evidence received at the administrative hearing in 1952 and to decide whether the administrative decision adverse to relators was legally justified. Shaughnessy v. U. S. ex rel. Mezei, 345 U.S. 206, 213-215, 73 S.Ct. 625. Judge Dimock decided that the evidence properly received at the administrative hearing did not support the administrative finding and the administrative decision, and that, as of 1952, relators were entitled to come into this country as citizens.
 After Judge Dimock had filed his opinion sustaining the writ, the government moved for a reargument and for a hearing de novo, on new evidence, before Judge Dimock. This motion was supported by an affidavit of Inspector Yarbrough. In part the affidavit related to an irrelevant showing of lack of discrimination beginning in 1955. Attached to the affidavit was an Exhibit showing that 40 Chinese persons, out of a total of 124, had been admitted without blood tests between March 1 and September 30, 1952. Relators in a reply affidavit stated: "It will be noted that most of these persons were admitted during the first part of the period involved before blood tests for all Chinese applicants was officially commenced. Moreover, the date of admission no doubt is the date of the final determination of admission and is not the earlier date of the arrival of the applicants at which time they would be examined by the Immigration Service. Dr. George F. Cameron of the United States Public Health Service testified in this case that he did not start blood testing until June 1952. It is obvious that a number of Chinese may have escaped blood testing in March, April and May, or even in June, before the mechanics for blood testing were devised and before the practice became uniformly established as it was at the time that the relators in this case were blood tested in July and August 1952. Dr. Cameron testified that when he began blood testing in June 1952 he was directed to blood test only Chinese and that he did not blood test any white persons. It is submitted therefore that Exhibit B annexed to Investigator Yarbrough's affidavit is of no assistance and supplies no basis whatsoever for a rehearing. Moreover, the statement that one Chinese recently was not blood tested obviously has no bearing on the uniform practice of blood testing all Chinese which was proved to exist commencing in June 1952."
 I think Judge Dimock correctly denied this motion. In addition to the insufficiency of the proposed additional evidence, it would have been improper for the judge to hold a de novo hearing. Moreover, the motion was an application for a new trial upon newly discovered evidence, and all the suggested new evidence had previously always been in the government's possession.