John Foster **DULLES**, as Secretary of State, Appellant,

v.

**QUAN YOKE FONG**, Appellee.

No. 15006.

United States Court of Appeals
Ninth Circuit.

Oct. 1, 1956.

Rehearing Denied Nov. 14, 1956.

Laughlin E. Waters, U. S. Atty., Max F. Deutz, James R. Dooley, Asst. U. S. Attys., Los Angeles, Cal., for appellant.

Kathleen Parker, Los Angeles, Cal., for appellee.

Before DENMAN, Chief Judge, and LEMMON and HAMLEY, Circuit Judges.

DENMAN, Chief Judge.

This is an appeal by Dulles from a judgment of the district court, declaring appellee to be a citizen of the United States. The suit was filed under Section 503 of the Nationality Act of 1940[1] on December 23, 1952, by appellee, a Chinese who was born in China on February 13, 1930.

Dulles' appeal makes two primary contentions. One is that the district court lacked jurisdiction to act under Section 503 because the failure to act on the application of May 13, 1952 in the period to December 23, 1952, is not a denial of a right of a claimed national of the United States. The other contention concerns the orders of the court denying Dulles' motion for a new trial to introduce evidence of blood tests of appellee and his alleged parents, and Dulles' denied motion for a new trial on the contention that he had new evidence of the blood tests. Dulles' brief makes no contention that, if the jurisdiction exists and the court did not err with regard to the motions, the judgment should be reversed.

I. Jurisdiction under Section 503 Existed for Appellee's Complaint.

May 13, 1952: Appellee filed an application with the United States Consulate in Hong Kong for a passport to come to the United States under Section 503. Nothing was done in this over-seven-months period, but the application was denied on January 6, 1953, only thirteen days after the repeal of Section 503.

The trial court found that prior to December 24, 1952, Dulles refused to grant appellee a travel document to enable him to come to the United States to testify in the present suit.

Dulles attempts to account for this long delay from May 13, 1952, to January 6, 1953, in disposing of the application, by the fact that about *three years* before, i.e., between January 1, 1948 and August 15, 1949, some 2,000 citizenship claims were accumulated in Canton, China. No contention is made that in this period the State Department sought from Congress funds for additional personnel or quarters in Canton to process this increase in claims. Nor after August 15, 1949, when these claims were added to those in Hong Kong is any attempt shown to secure from Congress funds for such purposes.

Yet with but a very slight addition to the Hong Kong Consul General's staff, appellee's application could have been disposed of a fortnight earlier. Since in Chin Chuck Ming v. Dulles, Cir. 9, 225 F.2d 849, at page 852 we hold that the words " 'right or privilege as a national of the United States' * * * cover the right to a prompt disposition of a claimed citizens' application", we now hold that here the delay above described constitutes a denial of such a right. Hence jurisdiction existed under Section 503 of the Nationality Act of

1. Now 8 U.S.C.A. § 1503.

1940 before December 24, 1952. Chin Chuck Ming, supra, at page 853.

II. The Court did not err in Denying Dulles' Motion to Continue the Trial to have a Test made of the Blood of Fong for Comparison with that of his Parents who were not Parties to the Action.

■ Dulles moved the court for blood samples of Fong and his parents, on the contention that "the blood group of plaintiff is incompatible with that of his alleged parents". (Tr. 11.) Such blood tests were ordered, that of Fong to be taken by a Dr. Ride of Hong Kong. This order was disobeyed and the blood taken by another doctor in Hong Kong, a Dr. Vio. Fong's blood was taken but was hemolyzed when it arrived in Los Angeles for analysis—that is, there were no red corpuscles remaining intact and hence it could not be tested.

Tests were also made of the parents, the father's affidavit stating that they were made pursuant to the court's order to them. These tests were not introduced in evidence but when it was discovered that Fong's blood was hemolyzed, Dulles moved for a supplemental order to take Fong's blood tests in Hong Kong. This the court denied, stating as its reasons the fact that the order to have the blood taken by Dr. Ride was disobeyed and also the long period between the filing of the petition on December 23, 1952, and Dulles' motion for the court's order for the blood test on May 6, 1955, that is, over two years and four months.

The court then proceeded to consider the evidence before it and gave its decision that Fong was the son of his claimed parents and hence a national and citizen of the United States.

Thereafter, Dulles moved for a new trial, claiming that he had newly-discovered evidence. This was that one Dr. Blifeld who had taken the blood tests of the parents on June 9, 1955, under the compulsion of the court's order to them, would testify that he had examined a second sample of Fong's blood again taken by Dr. Vio in Hong Kong and not the Dr. Ride specified by the court's order. On this sample he would testify that Fong's blood group is entirely different from that of the blood groups of his parents, which had been taken during the trial. His motion for a new trial was denied.

Dulles contends that, though the government twice disobeyed the order specifying the physician who was to invade Fong's body for his blood and made his motions on blood taken by another physician, nevertheless the court erred in denying them. Fong contends that the long delay of Dulles in seeking the blood tests and that the blood Dulles offered was not taken from Fong by the physician specified by the court, and that the court was without jurisdiction to order the blood tests of the parents, warranted the denial of the motions.

■ We think the court was without jurisdiction to order that the blood for the tests be taken from the parents' bodies, and that the judgment must be sustained.

Rule 35(a)[2] reads as follows:

"*Order for Examination.* In an action in which the mental or *physical condition of a party is in controversy*, the court in which the action is pending may order *him* to submit to a physical or mental examination by a physician. The order may be made only on motion for good cause shown and upon notice to the party to be examined and to all other parties and *shall specify* the time, place, manner, conditions, and scope of the examination and *the person or persons by whom it is to be made.*" (Emphasis supplied.)

It confines the right to take blood from human beings to those whom the court "shall specify". Fong Sik Leung v. Dulles, 226 F.2d 74 at page 79. It limits the persons who can be compelled to submit to the taking of blood from their bodies to *parties* to the action in which

2. Fed.Rules Civ.Proc. rule 35(a), 28 U.S.C.A.

their physical condition is in controversy. Fong Sik Leung v. Dulles at pages 76 and 81. The court has no jurisdiction to compel a person not a party to the action to yield his body to the invasion of a physician's instruments. It was a legal wrong to Fong for the court to go outside its jurisdiction and compel his parents to give evidence against him.

In view of the fact that the father's affidavit states that his and his wife's blood was given under the compulsion of the court's order so made without its jurisdiction, it would be futile to grant any motion to take the blood of Fong for comparison with theirs. Yee Szet Foo v. Dulles, D.C.S.D.N.Y., 18 F.R.D. 237, 239; Chin Nee Deu v. Dulles, D.C.S.D.N.Y., 18 F.R.D. 350, 351.

Since the court had jurisdiction of this Section 503 proceeding and its denials of Dulles' motions are not error and Dulles makes no contention that the evidence before the court does not support the court's determination that Fong is a national and citizen of the United States, the judgment is affirmed.

LEMMON, Circuit Judge (dissenting).

Because of the trial judge's cavalier denial to the appellant of a reasonable opportunity to present his defense, I am forced to dissent.

On June 1, 1955, the appellee put on three witnesses. The District Judge announced that the matter would not yet stand submitted, but would await "the receipt of the blood and the report of the doctor," after which "we will have to have the doctor here to testify what it means".

On July 1, 1955, the appellant made a "Motion for Supplemental Order to Require Plaintiff [appellee] to Furnish Blood Sample", whereby it was sought to require the appellee to appear at Hong Kong before a physician "or other persons to be designated by the Court, and there to furnish and permit such physician or other persons to take a sample or samples of his blood in sufficient quantities so that such blood may be transported to the United States of America and there be examined and tested by a physician, hematologist, serologist, or other person for blood grouping and type".

On August 16, 1955, the Court announced that it was denying the appellant's motion, and was ordering judgment for the appellee. At no time did the appellant formally close its case.

Thereupon counsel for the appellant made a formal offer of proof, declaring that "The government at this particular stage has actually obtained the results of a blood test of the parents."

The Court replied that it had ruled. Counsel for the appellee then pleaded as follows:

"Mr. Dooley. If your Honor would just hold your opinion for the purpose of permitting the government to make an offer of proof of the result of the blood test, then the matter could go up to the Circuit and they could determine whether the results of the blood tests which have been obtained pursuant to an order—"

The District Judge then interrupted counsel with the observation that "This is not a proper case".

On September 9, 1955, the appellant filed a motion for a new trial.

On October 3, 1955, after considerable colloquy between Court and counsel, the latter elaborated on his offer of proof with much specificity:

"Mr. Dooley. Your Honor, in this case the plaintiff has been tested. The blood of his parents has been tested. We have the results set forth in the affidavit of the laboratory technician. Then I have the affidavit of Dr. Rubinstein who, from an examination of the experience he lists in his affidavit, is well qualified as a hematologist. He taught hematology for ten years at Columbia University and, as stated in his affidavit, he is willing to come and testify. The laboratory technician is willing to come and testify,

and Dr. Rubinstein will testify *it is impossibile for the alleged father to be the father*, according to the affidavits. We have that evidence in the form of affidavits here *that it is impossible for this plaintiff to be a citizen of the United States.*"

\* \* \* \* \* \*

"I can say, your Honor, from the literature I have read on the subject, I can be sure there will not be a disagreement among the experts as to the meaning of the blood tests in this case. We have the affidavit of Dr. Rubinstein that the father could not be the father of Quan Yoke Fong. We do not believe that there will be a dispute as to the meaning of this test."

Near the close of dialogue, the District Judge gave counsel for the appellant a personal gibe:

"Mr. Dooley. \* \* \* I think the real question, your Honor, since we have the evidence—

"The Court. The real question, Mr. Dooley, is you just don't like to give up. You just don't like to quit."

In his brief, the appellee comments thus upon the offer of proof:

"Appellant's argument to the court on August 16, 1955, at which time he urged the court to permit him to make an offer of proof, was directed solely to the results of the blood tests of the parents taken pursuant to the invalid order of the District Court of May 10, 1955, and the result of the blood test of the sample allegedly taken from the plaintiff on August 12, 1955, at the direction of the appellant and without court order."

The brief then cites three pages of the transcript in support of the above statement. I have carefully scrutinized not only the three pages cited, but all the colloquies between Court and counsel, from which I have already copiously quoted. I can find no reference to an order of May 10, 1955, or to a "sample allegedly taken from the plaintiff on August 12, 1955." No dates whatever relating to an order of the Court or to a blood sample were mentioned throughout the entire dialogues. For aught we know, counsel for the appellant might have been referring to an entirely different blood test. He was not permitted to make a formal offer of proof, and could slip in references thereto only "by the back door", so to speak. The appellee's statement is pure conjecture, so far as the cited record pages show.

In criminal cases, the Government labors under severe handicaps, such as the proscription against referring to the fact that the defendant has not taken the stand, or the inability to appeal after a trial on the facts. In a civil case, at least, even the sovereign should be permitted to put in its proof—a right accorded to the humblest citizen. Perhaps what is needed is a second Magna Charta or a second Bill of Rights—one to protect the interests of the Government.