ET MIN NG, Appellant,

v.

Herbert BROWNELL, Jr., Attorney General of the United States, Appellee.

No. 15767.

United States Court of Appeals
Ninth Circuit.

Aug. 5, 1958.

N. W. Y. Char, Honolulu, Hawaii, Wm. J. Gintjee, San Francisco, Cal., for appellant.

Louis B. Blissard, U. S. Atty., Charles B. Dwight, III, Asst. U. S. Atty., Honolulu, Hawaii, for appellee.

Before STEPHENS, Chief Judge, and DENMAN and HAMLEY, Circuit Judges.

HAMLEY, Circuit Judge.

█ Et Min Ng brought this action against the Attorney General of the United States for a judgment declaring plaintiff to be a national of this country.[1] After a trial without a jury, judgment was entered for defendant. Appealing from that judgment, plaintiff specifies as error the admission of evidence pertaining to a certain blood-grouping test. He also contends that certain findings of fact are clearly erroneous.

Appellant, who was born in China in 1933, arrived at Honolulu on May 15, 1952, and requested admission as a United States citizen. He claimed citizenship by reason of being the asserted son of Hung Way Ng, who, it was claimed, was a citizen of the United States. A board of special inquiry of the Immigration and Naturalization Service determined, after hearing, that this claim was well-founded. That board accordingly, on June 4, 1952, entered an order admitting Et Min Ng as a citizen of the United States.

On May 28, 1953, proceeding under § 341 of the Immigration and Nationality Act, 8 U.S.C.A. § 1452, appellant applied for a certificate of citizenship. The Immigration and Naturalization Service rejected the application, holding that Et Min Ng was not the son of Hung Way Ng. Since Et Min Ng had no immigrant visa, the Service then instituted a deportation proceeding against him.

Following hearings held on August 10 and 13, 1954 and February 2, 1955,[2] the special inquiry officer entered a deportation order against Et Min Ng, based on a finding that he was not the son of Hung Way Ng. On appeal, the Board of Immigration Appeals, on July 13, 1955, upheld the order of deportation.

The instant action for a declaratory judgment was then instituted. At the trial, appellant rested his case after he and his asserted father had testified. The principal evidence produced by the Government consisted of exhibits and testimony relating to a blood-grouping test made in connection with appellant's 1953 application for a certificate of citizenship. The purport of this evidence was to the effect that Et Min Ng could not possibly be the son of Hung Way Ng.[3]

Appellant objected to the introduction of this evidence on several grounds. All objections were overruled and the evidence was received. The trial court found, on the basis of this evidence, that appellant was not the son of Hung Way Ng. It was therefore concluded that appellant is not a citizen of the United States, and the judgment entered denies the requested relief.

We will first consider appellant's contention that it was error to admit the evidence relating to the blood-grouping test.

This contention is based primarily on the ground that appellant and his asserted father did not submit voluntarily to the blood test. It is urged that they were coerced into doing so by personnel of the Immigration and Naturalization Service. This was accomplished, according to appellant, by misrepresenting to him and his claimed father that, under then existing rules and regulations, a certificate could not be obtained without first submitting to such a test.

Reception in the trial court of evidence procured under these circumstances, appellant urges, deprived him of due process of law as guaranteed by the Fifth Amendment.

1. Jurisdiction was based on § 360(a) of the Immigration and Nationality Act, 8 U.S.C.A. § 1503(a), and the Declaratory Judgments Act, 28 U.S.C.A. § 2201.

2. After the August 1954 hearing, the special inquiry officer entered a deportation order. Et Min Ng appealed to the Board of Immigration Appeals, which remanded the proceeding for further evidence. The reopened hearing was held on February 2, 1955.

3. The official report on this test reads in part:
"* * * On the basis of the MN typing, since Ng, Et Min, lacks the N factor, he could not be the son of Ng, Hung Way. Ng, Hung Way has the N factor which means that all children would have to be either type N or MN, regardless of the mother's MN type."

It is not to be doubted that, in this declaratory judgment action, appellant was entitled to a trial conforming to traditional standards of fairness as encompassed in the concept of due process of law. This is not a rigid concept, but depends, to a large extent, upon "an appraisal of the totality of facts" in the particular case.[4] We turn, then, to an examination of the circumstances under which the blood specimens here in question were procured, and the resulting blood-test evidence utilized.

When appellant applied for a certificate of citizenship in 1953, he was unable to present any documentary proof of citizenship. Because of this, personnel of the Honolulu office of the Immigration and Naturalization Service asked appellant and his alleged father to submit to a blood-grouping test. In this connection, they were requested to sign individual mimeographed forms then in use by the Honolulu office.

These forms, as filled in, contain a recital to the effect that the signer agrees to submit to a blood test in connection with the application for a certificate of citizenship. Another recital in the form is to the effect that the signer understands that the blood test could prove that the relationship contended for could not possibly exist. The meaning of these forms was explained to appellant and his claimed father, after which they signed the forms prepared for their respective signatures, and submitted to the test.

The results of the test convinced the Honolulu office of the Immigration and Naturalization Service that Et Min Ng could not possibly be the son of Hung Way Ng. The application for a certificate of citizenship was therefore denied, and, as before noted, a deportation proceeding was instituted.

In the August 1954 deportation hearing, the Government offered, and there was received in evidence, testimony and exhibits relating to the 1953 blood test. Appellant, represented by counsel at that hearing, made no objection to the admission of such evidence on the ground that the test was not submitted to voluntarily. Additional evidence relating to the 1953 blood test was received at the further deportation hearing held in February 1955. Again, there was no objection on the ground now under discussion. There was likewise no contention of this kind during either of the appeals to the Board of Immigration Appeals.

Appellant testified for the first time at the trial in this declaratory judgment action. While he was on the witness stand during the presentation of plaintiff's case, he testified: " * * * I was told by the Immigration Service at Honolulu that since I did not have documents to prove my case, I was required to go through a blood test because that is the new regulations." This was the first hint that appellant would contend that he had been coerced into signing the consent form, and had not voluntarily yielded a blood specimen. This first appearance of such a contention, however, soon evaporated into nothingness, for the quoted testimony was, on the motion of appellant's counsel stricken as unresponsive.

The blood-test evidence came into this trial during the presentation of the Government's case. First, Harry K. C. Ching, an official interpreter and translator for the Service, was called to identify the consent forms which appellant and his claimed father had signed.[5] Et

---

4. Betts v. Brady, 316 U.S. 455, 462, 62 S. Ct. 1252, 1256, 86 L.Ed. 1595, involving the due process clause of the Fourteenth Amendment. The court there said: "That which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such denial."

5. Ching explained the purpose of such forms in these words: "Well, that is a standard form used by the Immigration Service whenever a person is required to have a blood test, when the applicant is applying for some document which the Immigration Service deems it necessary to have a blood test. And this is the form, standard form, they have to sign."

Min Ng was next called as an adverse witness, and identified his signature on one of these forms. He then gave the first testimony which remains in the record bearing upon the question of coercion.[6]

Later in the trial, there was additional testimony from appellant to the effect that he had been "forced," or "required," to submit to the test, or had been "coerced" into taking it.[7] In one such statement, he testified that had he not been told that such a test was required, he would not have voluntarily submitted to it.

No testimony was offered to the effect that appellant's asserted father had been coerced into submitting to a blood test. Except for the inferences which may be drawn from Ching's testimony, referred to in footnote 5, the Government offered no testimony with regard to whether either appellant or his claimed father had been subjected to coercion.

Accepting at face value all of appellant's testimony which was not stricken, it would appear that in 1953 the Honolulu office of the Immigration and Naturalization Service required applicants for certificates of citizenship who presented no other documents to submit to a blood test as a condition precedent to action on the application. But the evidence does not support the statement made by the trial court in its oral decision, that appellant was advised that this was a requirement "under the rules and regulations of the Service."

6. He testified:

"A. I affixed my signature on this form. It was because the Immigration Office refused to issue me this document and I was forced to affix my signature there.

"Q. Who forced you? A. The examiner.

"Q. What did he say to you? A. The examiner told me that because I did not have any documentary proof, so I was forced to go through this blood test. And if I do not go through this blood test, I would not be issued this document, and because I had wanted this document, therefore, I was forced to affix my signature on this document form.

"Q. Because you wanted the document, is that correct? A. Yes."

7. Appellant testified:

"Q. (By Mr. Dwight) After you had finished testifying did the examiner ask you to do anything further? A. After the hearing was over the examiner told me that because I did not have the necessary documentary evidence, hence I was required to go through a blood test before I would be given this Certificate of Citizenship.

"Q. Did you fill out any papers or forms at the Immigration Service in order that you could take a blood test? A. Yes. I was forced to affix my signature on a form in order to take this blood test.

"Q. Will you explain what you mean by 'forced'? A. In other words, I was coerced.

"Q. Isn't it true that you were told by the examiner that because you didn't have any documentary evidence he would require a blood test before he would grant the Certificate of Citizenship? A. Yes, the examiner told me that it is the new law of the United States that requires me to go through this blood testing.

"Mr. Dwight: I move to strike the last part of the answer as unresponsive to the question, your Honor.

"The Court: Which part?

"Mr. Dwight: Everything after 'Yes.' If he wants to bring that out later, he may, but that is not responsive to the question at all.

"The Court: It may go out."

"Q. (By Mr. Char) After your hearing before the examining officer in your application for a Certificate of Citizenship in 1953 and before signing Defendant's Exhibit 2, state what did the examining officer say to you? A. The examiner said that because I did not have the necessary documentary evidence I must go through a blood test.

"Q. If the examiner had not said that you were required to take a blood test, would you voluntarily have given yourself for a blood test? A. No."

"Q. (By Mr. Dwight) And were you willing to take a blood test in order to get it [certificate of citizenship]? A. I was told that I have to go through this blood test before I could get this certificate. There is no other way of getting it.

"Q. Were you then willing to take the blood test to get the certificate? A. Because there was no other way of securing the certificate, therefore, I had to go through this blood test."

The trial court stated, in its oral opinion, that there was in effect in 1953 an appropriate immigration rule and regulation allowing the Service to require a blood test when one applied for a certificate of citizenship. If the court was here referring to a formal rule or regulation, its statement is incorrect. There was no such formal rule or regulation until January 3, 1955.[8]

There is some indication, however, that there may then have been in effect an instruction or directive authorizing the procedure which the Honolulu office followed. In United States ex rel. Lee Kum Hoy v. Shaughnessy, 2 Cir., 237 F.2d 307, reversed on other grounds, sub nom. United States ex rel. Lee Kum Hoy v. Murff, 355 U.S. 169, 78 S.Ct. 203, 2 L.Ed. 2d 177, there is a discussion of the history of blood tests in Immigration and Naturalization Service proceedings. Reference is there made to instructions promulgated in early 1953, dealing with visa petitions and certificates of citizenship.

If it be assumed, however, that the Honolulu office was not authorized to require such tests in 1953, a representation made to appellant that his application would not be acted upon until such a test was made would nevertheless have been truthful. That was, indeed, the practice of the Honolulu office in 1953. If appellant has a grievance, then, it is not that he was falsely told that there was a general Service rule or regulation requiring the test. Rather, it is that, without authority to do so, the Honolulu office insisted that a test be made before it would act.

On the assumptions which have been made, the position taken by the Honolulu office was, in a sense, coercive. But it is likewise clear that the record provides no basis for the charge that fraud was practiced upon appellant. At worst, appellant acceded to a requirement which Service personnel had no authority to impose. He has not proved that he was the victim of purposeful misrepresentation.

■■ There are other considerations which must also be borne in mind. The basic contention that appellant was coerced into signing the consent form is suspect, because it was only lately advanced. If there was coercion, due to the unauthorized insistence of the Honolulu office that a blood test be taken, it was not of a kind which could affect the reliability of the evidence procured. There can be no claim that justice has miscarried, since the tests show that appellant is not the son of his claimed father. Had this blood-test evidence been excluded, and had the Government then requested appellant to submit to a new test, his refusal to do so would give rise to an inference adverse to appellant.[9] If a new trial were ordered, the trial court could require appellant to submit to such a blood test.[10]

Absent a proved taint of fraud, and present these other considerations, we conclude that reception of the blood-test

---

**8.** 8 C.F.R., § 10.1, published 19 Fed.Reg. 8058, December 8, 1954, effective January 3, 1955, reads in part:
"* * * The Service officer authorized to make decisions, may, in his discretion, require the submission of additional evidence, including blood tests where that is deemed helpful and appropriate. * * *"

**9.** See Matter of D-W-O and D-W-H, 5 I. & N.Dec. 351.

**10.** See Rule 35(a), Federal Rules of Civil Procedure, 28 U.S.C.A.; Dulles v. Quan Yoke Fong, 9 Cir., 237 F.2d 496; Fong Sik Leung v. Dulles, 9 Cir., 226 F.2d 74; United States ex rel. Dong Wing Ott v.

Shaughnessy, 2 Cir., 220 F.2d 537; Lue Chow Kon v. Brownell, 2 Cir., 220 F.2d 187; Beach v. Beach, 72 App.D.C. 318, 114 F.2d 479, 131 A.L.R. 804; Yee Szet Foo v. Dulles, D.C., 18 F.R.D. 237. Such a test could not be required of appellant's claimed father, since he is not a party to the action. Dulles v. Quan Yoke Fong, supra. But there is no testimony in this record, or finding, that the blood specimen yielded by appellant's asserted father was coerced. Appellant testified only as to the representations made to himself. The alleged father declined to testify on the point, invoking the self-incrimination clause of the Fifth Amendment.

evidence procured in the manner indicated did not deprive appellant of due process of law.

 Apart from the due process clause of the Fifth Amendment, appellant asserts it was error to admit the blood-test evidence for the following reasons: (1) The evidence was procured in a manner which violated his right of privacy; (2) such a test may not be demanded of a citizen as distinguished from an alien; and (3) the "consent" given in 1953 was with reference to that particular proceeding, and was not a consent to the use of the evidence in any other proceeding. We find these contentions to be without substance or merit.

This brings us to appellant's argument that the finding of fact that he is not the son of Hung Way Ng is clearly erroneous.

Appellant correctly states that this finding was based upon the evidence pertaining to the blood test. It is argued that this evidence is unreliable and should not have been accepted as overcoming the prima facie case submitted by appellant.[11]

Specifically, it is urged that (1) the worksheet on which the results of the test were tabulated contained an obvious and unexplained error, consisting of the presence of an "M" underneath the "N" where Hung Way Ng's "MN" blood factor is recorded; (2) the form from which the final report was made, and which could possibly have confirmed or explained this error, was not produced; (3) the persons who performed the test were not qualified; (4) the witness who interpreted the results of the test was not qualified, and was an "interested" person, because he was director of the Honolulu blood bank; and (5) the test was not performed properly, and in accordance with scientific methods, because the person who did the testing called out the results to a recorder, instead of recording them herself.

These considerations were brought to the attention of the trial court. It nevertheless found, in effect, that the results of the test were reliable, and should be given great weight.[12]

In our view, the trial court did not abuse its discretion in determining that the technicians who made the test, and the doctor who interpreted the results, had the necessary expert qualifications.

The remaining considerations advanced by appellant bear upon the weight to be attached to the evidence. The record before us affords no basis for a ruling that the ultimate evaluation which the trial court placed upon the evidence was faulty, or that the finding of fact

---

11. In this action, appellant had the burden of proving that he is an American citizen. Augello v. Dulles, 2 Cir., 220 F.2d 344. He established a prima facie case by showing that on June 4, 1952, a special board of inquiry had admitted him to the United States as an American citizen. McGrath v. Chung Young, 9 Cir., 188 F.2d 975. This 1952 determination, however, was not res judicata. Lum Mon Sing v. United States, 9 Cir., 124 F.2d 21; Flynn ex rel. Ham Loy Wong v. Ward, 1 Cir., 95 F.2d 742. The Government was entitled to overcome this prima facie case, if it could, by showing that the 1952 determination had been obtained by fraud or error. It sought to do so by introducing in evidence the results of the 1953 blood test.

12. In this connection, the court found:
"VII. The blood so extracted was tested under extremely careful, controlled conditions by two qualified technicians; the results were tabulated on a worksheet by the technicians and were compiled and sent to the doctor who himself was a highly qualified expert serologist. The doctor corollated the results of the blood tests as compiled by the technicians.
"VIII. The results showed that, as relates to the MN blood typing, the alleged father had type N blood and the alleged son and plaintiff herein had type M blood.
"IX. The mechanics of the blood tests were done with such care that any possibility of error was reduced to a minimum, and the alleged discrepancy raised concerning the worksheet only goes to prove that the control methods used by the Blood Bank of Hawaii are excellent, and the results of the blood tests should be given great weight."

on the question of paternity was clearly erroneous.[13]

Affirmed.

DENMAN, Circuit Judge (concurring).

I concur in the reasoning of the court that appellant plaintiff failed to maintain his burden of proof. It is further supported by the testimony of the disinterested witness Ching that he read to both the father and the son the document containing their agreement to allow their blood tests and explained it to them before they signed it. This fully supports the Court's finding V stating:

"During the course of Plaintiff's application for a Certificate of Citizenship, he and his alleged father were requested to take a blood test. *This, Plaintiff and his alleged father voluntarily agreed to do,* as evidenced by documents signed by them, and which were explained to them through a Chinese interpreter at the Immigration and Naturalization Service." (Emphasis supplied.)

On appeal it *must be presumed* that the Court accepted this evidence and disbelieved their inconsistent testimony to the contrary. No more seems needed to dispose of their long delayed contention that they were coerced.

This conclusion and that concerning the abuse of the right of privacy is further supported by the reasoning of the recent opinion of the Supreme Court in Breithaupt v. Abram, 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448, holding that the taking of a blood test without the consent of the person subject to a qualified physician's hypodermic withdrawal of the blood, is not violative of any constitutional right.

13. There is some contention that the trial court erred in accepting the results of the blood test as "conclusive." This refers to the finding of fact that "the results of the blood tests show conclusively that Ng Hung Way, the alleged father of the Plaintiff, cannot possibly be the father of the Plaintiff." The court was not here stating a proposition of law to the effect that, in all cases, the results of such a test must be accepted as conclusive. It was referring only to the appraisal placed upon the results of this particular test, considered in relation to all other evidence. This is made clear by the court's immediately-preceding finding that "the results of the blood tests should be given great weight."