MATTER OF L——

In DEPORTATION Proceedings

A–10635395

*Decided by Board February 19, 1959*

**Evidence—Blood-grouping tests—Exclusion of parentage through Rh system.**

As with the A-B-O and M-N systems, the same conclusive effect is given Rh blood-grouping tests which exclude paternity when the test results are consistent and uncontroverted and the interpretation is made by a recognized authority.

CHARGE:

Order: Act of 1952—Section 241(a)(1) [8 U.S.C. 1251(a)(1)]—Excludable at time of entry—No immigrant visa.

**BEFORE THE BOARD**

**Discussion:** Respondent is a native of China, 29 years of age, who was admitted to the United States on April 21, 1956, as the United States citizen son of L——Y——W——, a citizen of the United States. Following his admission he filed an application for a certificate of citizenship. The special inquiry officer found, following a hearing, that recently-developed evidence establishes that the respondent is an alien, a native and citizen of China, that he was not entitled to enter the United States as a citizen and is, therefore, deportable on the charge contained in the order to show cause. Respondent appeals to this Board from the order of deportation.

Following his application for a certificate of citizenship, and at the request of the Immigration and Naturalization Service, respondent and his alleged parents were asked to cooperate in the performance of blood-grouping tests. On September 28, 1956, accompanied by an immigrant inspector, they went to the Western Laboratories in San Francisco, California, where blood samples were taken for the purpose of establishing the groups, types and factors in the blood of respondent and his alleged parents. These tests are designed to establish the possibility or impossibility of the claimed parentage or relationhip between respondent and the alleged parents. The pathologist who supervised the tests was Dr. Leonard Ortega, who later testified as to his own qualifications, described the techniques

259

used in his laboratory, and the meaning of the test results and of the forms filled out and signed by him, part of exhibit 2.

On July 8, 1957, respondent and his alleged parents again cooperated in the performance of blood tests at the Latham Square Laboratories in Oakland, California, accompanied by Mr. H——K——, their attorney. Dr. Paul Steiner later testified as to his own qualifications as a pathologist. He was not questioned by anyone regarding the methods used in his laboratory or the circumstances under which the tests were made. He was not asked whether he performed these tests or supervised their performance.

The results of the tests performed at both laboratories are identical. It was conceded by the examining officer and by counsel for the respondent that the interpretation of the test results is the primary issue in this case. The special inquiry officer stated to the attorney that it was his understanding that the Government contends that respondent is not the son of the alleged parents, and that counsel contends that he is the son of the alleged parents, and "that is the issue." Both counsel and the examining officer agreed to that statement of the case. The special inquiry officer stated further, "Then as I understand it there is no issue as to the accuracy or the methods used in the blood-grouping tests?" Counsel and the examining officer agreed there was no such issue.

We have had several cases wherein the testers for varying reasons had arrived at different results, but this is the first blood-grouping case to our knowledge wherein the test results are the same, but the testimony of two pathologists is conflicting as to the meaning of the tests. The findings of the two laboratories are reported in different forms, even though they purport to state the same test results. It is our opinion that the table appearing in Dr. Weiner's letter is most easily comprehended by nonmedical persons. (Dr. Alexander Weiner was chosen by both parties as arbiter, as we shall relate.) He states:

The findings of the two doctors may be summarized as in the table below:

| Blood of— | Group | M-N type | Rh-Hr type |
|---|---|---|---|
| Y——W——L—— (putative father) | O | MN | Rh₁rh |
| M——Y——L——L—— (putative mother) | A | MN | Rh₁Rh₁ |
| J——K——L—— [respondent] | A | M | Rh₁Rh₂ |

Dr. Ortega testified that following his graduation from medical school he had extensive training and experience in the field of pathology, that he supervised laboratories and blood banks in Texas and California, that he is at present an instructor of pathology at the University of California School of Medicine, that he has performed hundreds of blood typings for the purposes of transfusions, for the

identification of blood stains in criminal proceedings, and for one to two hundred cases involving disputed paternity. He was asked who in his opinion were the outstanding authorities in the field of blood grouping and testing, and he named Dr. Alexander Weiner of New York, Dr. Race in England and Dr. Philip Levine in New Jersey. He testified that an exclusion of paternity may be demonstrated as the result of tests concerning any one of the three blood systems used for this purpose in routine medicolegal use. He stated that the first tests used in paternity cases concern the A-B-O system, next the M-N system, and last the Rh-Hr system, and that all the tests used demonstrate results which have firm bases in genetic law. He testified that the tests made in the instant case were actually performed four times in his laboratory, twice by each of two different technicians. The tests were repeated because they discovered there was an exclusion of parentage. He testified that the test results establish that respondent cannot be the child of the alleged father and mother, and that the exclusion of paternity was not discoverable through the A-B-O or the M-N tests but is established by the Rh-Hr tests.

Dr. Ortega testified that respondent, the alleged son, has in his blood the factor rh", and that both parents "are negative for this factor." He stated, "For this factor to appear in a child it has to be present in one or both parents. It is simply a matter of heredity that the child cannot have something that neither parent has." He was asked, "Doctor, is it your opinion that this is a conclusive finding?" He answered, "In my opinion, yes, it is a conclusive finding." On cross-examination Dr. Ortega's testimony reads as follows:

Q. And if I were to tell you, Doctor, that I had a statement in writing by a pathologist who presumably is well qualified to the effect that he is not prepared to say that paternity is excluded in this case on the basis of the Rh factor, what comment would you have?

A. My comment would be that this pathologist is certainly at variance with practically every other serologist in the world.

Counsel called Dr. Paul Steiner, who testified to his medical school, graduate school, and special training in pathology. He testified that he is assistant pathologist and consultant pathologist to a number of laboratories and institutions in the San Francisco area, including the Veterans Administration and Mare Island Naval Hospital. He was asked to name the outstanding experts in the field of blood grouping, and he named the same three experts named by Dr. Ortega: Dr. Alexander Weiner, Dr. Race (whom he referred to as Race-Sanger, apparently a team) in England, and Dr. Philip Levine. Dr. Ortega and Dr. Steiner testified separately, not in the presence of one another, and approximately two weeks apart. Dr. Steiner referred briefly to the A-B-O and M-N systems and then discussed at length the Rh system and the differences in nomenclature with

regard to that system, describing the C, D, E, c, d, e designations developed by the British doctors Race and Sanger, and the Rh-hr symbols, developed by Dr. Weiner in this country. Dr. Steiner prefers to use the designations C, D, E, c, d and e for purposes of simplicity, rather than the Rh-hr designations. The subject of blood-group nomenclature is discussed in the "Supplementary Report of the Committee on Medicolegal Problems, American Medical Association," reprinted from the *Journal of the American Medical Association*, August 31, 1957, vol. 164, pp. 2036–2044. It is a controversy with which we need not concern ourselves here.

Dr. Steiner testified that exclusion of paternity based on what he terms the big E factor (rh") alone is too controversial to be fair. He considers it to be "a matter of doubt." It is his belief that the "big E factor" may consist of several factors, and that not enough is known about it at this time to justify basing an exclusion of paternity on that test. He quoted from several publications he believes support his view. He read from the *American Journal of Human Genetics*, December 1952, an article by Dr. Weiner, whom he quotes as saying, "The existence of individuals with the red cells lacking both factors Rh" and Hr" has an important implication for the medical-legal application of these tests in cases of disputed parentage, and this could lead to erroneous exclusions of parentage." It seems to us that this statement is not pertinent to the instant case. These persons are not lacking both Rh" and Hr"; the respondent's blood has in it the factor Rh" and, judging from Dr. Steiner's own test reports, he found the reaction to the anti-e (hr") serum to be "positive as to all three parties." The tests done by Dr. Ortega did not include the "e" (hr") test which is not recommended by the American Medical Association Committee.

Dr. Steiner continued his testimony by reading from the Supplementary Report of the Committee on Medicolegal Problems, American Medical Association, referred to above. The Committee consisted of Dr. Weiner, Chairman, and three other persons. Assuming the record we have to be correct, Dr. Steiner did not read the report accurately. The record we have quotes him as follows:

* * * and finally the *Journal of the American Medical Association* of August 31, 1957 in a report of the Committee on Medical-Legal Problems in an article Medical-Legal Applications of Blood Grouping Tests, says here. 'With regard to the Rh system and *particularly to the Rh" factor* obviously the medical-legal application of such factors is premature. Indeed because the lack of availability of adequate amounts of suitable anti-serums and the limited knowledge due to the small number of investigations carried out to date the routine use in medical-legal work *of the Factors Rh"* is inadvisable.' (Emphasis added.)

The report Dr. Steiner quotes from was not placed in evidence. The special inquiry officer should have requested that it be made

part of the record. However, the report is available to us and it is clear that Dr. Steiner misread the paragraph quoted, and taken out of context the meaning is changed. The quoted paragraph, *in toto*, read as follows:

Recent work has revealed the existence of still other factors belonging to the Rh-Hr system, notably, factor V, often found associated with the genes r and R°, especially in Negroes. In addition, a series of new Rh factors has been discovered that, with rare exceptions, occur in association with the factor Rh₀ (similar to the association of factor rh$^w$ with rh') and that have tentatively been designated as RhA, RhB, and so forth. Obviously, the medicolegal application of such factors is premature. Indeed, because of the lack of availability of adequate amounts of suitable anti-serums and the limited knowledge due to the small number of investigations carried out to date, the routine use in medicolegal work of *factors rh$^w$, hr'', and hr* is inadvisable. This Committee recommends, therefore, that for routine medicolegal work, for the present, the Rh-Hr test be limited to the factors Rh₀, rh', rh'', and hr'. (Emphasis added.)

The Committee report had already discussed the fact that there are at the present time four principal Rh blood factors and three principal Hr factors recognized. It states, "However, anti-serums for only four of these seven factors are readily available for routine clinical and medicolegal work, namely, anti-Rh₀, anti-rh', anti-rh'', and anti-hr'." The report discusses many rh and hr factors, some of them rarely encountered, and clearly is discussing these factors in the paragraph read by Dr. Steiner (quoted above) when they recommend that the tests for the rare and newly-discovered factors not be used in routine medicolegal work. The Committee again says, "As has already been pointed out, in medicolegal cases the paternity blood tests are generally limited to the factors Rh₀, rh', rh'' and hr'. Actually many more Rh-Hr factors have been found."

Dr. Steiner again quoted from the Summary and Conclusions of the Committee (Supplementary Report), "It is recommended that routine medicolegal applications of blood grouping be restricted at present to tests for the four blood groups, O, A, B, and AB of the A-B-O system; the three types M, N, and MN of the M-N-S- system; and factors Rh₀, rh', rh'', and hr' of the Rh-Hr system." Dr. Steiner's comment on this recommendation is, "Now here they omit expressly the factor hr'' which is the one present in the two parents." This seems to us to be a *non sequitur*, since the exclusion of paternity in this case is not based upon the presence of the factor hr'' in the two parents, found by Dr. Steiner's tests. This is one of the factors for which the Committee of the American Medical Association recommends routine tests *not* be made. The exclusion here is based upon the fact that the element rh'' is present in respondent's blood and is not present in the blood of the alleged parents.

It is not necessary for us to attempt to resolve the conflict between the conclusions of Dr. Steiner and Dr. Ortega. When it became

apparent to the special inquiry officer, counsel, and the examining officer that the two doctors had conflicting opinions, the examining officer asked Dr. Steiner if he felt that Dr. Weiner is the outstanding authority in this field in this country, and if Dr. Steiner would accept Dr. Weiner's word as final in this case if the tests were submitted to him for decision. Dr. Steiner answered, "Yes I do, not the only one but one of the outstanding authorities. Dr. Philip Levine is probably equally qualified, but he is not as flamboyant as Dr. Weiner is * * *." The examining officer then moved that the testimony of the two witnesses and the two sets of tests be submitted to Dr. Weiner for a final opinion. Counsel stated that he had no objection to that and stipulated that he was willing to be bound by the results of Dr. Weiner's opinion. The examining officer also so stipulated.

Dr. Weiner's letter addressed to the Immigration and Naturalization Service at New York, July 16, 1958, signed and notarized, is exhibit 3 in the record. Dr. Weiner's table summarizing the results of the blood-grouping tests herein has been set forth above, and will not be repeated here. The rest of Dr. Weiner's certification reads as follows:

Mr. E—— McG—— showed me the records of the above-named case including the report of Dr. L. R. Ortega of the Western Laboratories in Oakland, California, the report of Dr. Paul S. Steiner of the Latham Square Laboratories of Oakland, California, and the testimony of Dr. L. R. Ortega and Dr. P. Steiner, all of which I have read. There appears to be no dispute about the results of the blood tests themselves, but only regarding the interpretation of the findings. While it is against my principles to offer an opinion based on tests which I have not done myself, in the present case, according to the testimony, the tests were done many times, always with the same results, so that it would be unreasonable to challenge the findings.

\*     \*     \*     \*     \*     \*

As far as the A-B-O and M-N tests are concerned the results provide no information as to the question of parentage. The Rh-Hr tests, however, show that J——K——L—— cannot be the child of Y——W——L—— and M——Y——L——L——. The reason for this is that two parents both lacking factor rh'' (otherwise known as factor E) cannot have a child with factor rh'' (or E). In the present case the putative father Y——W——L—— is type $Rh_1rh$ lacking factor rh'' (or E) and the putative mother, M——Y——L——L—— is type $Rh_1Rh_1$ lacking factor rh'', while the putative son, J——K——L—— is type $Rh_1Rh_2$ having factor rh''. Therefore J——K——L—— is not the son of the putative parents, Y——W——L—— and M——Y——L——L——.

The hearing was reconvened on September 18, 1958, in San Francisco, at which time counsel objected to the acceptance in evidence of Dr. Weiner's report "on the ground that the witness has impeached himself." Counsel, admittedly basing his opinion on the "quoted remarks of Dr. Weiner" as read into the record of hearing by Dr. Steiner, states that he believed "that Dr. Weiner would rule out exclusion of paternity on the basis of the big E factor of the Rh."

Counsel continued, "However, since Dr. Weiner has now repudiated *what he was quoted as saying* the previous time I don't feel bound by the stipulation * * *" (emphasis added). It is apparent that counsel did not study the report of the Committee of the American Medical Association himself, but based his opinion on the reading of it by Dr. Steiner. If our copy of this report is correct, then Dr. Steiner's reading of it cannot be correct.

The special inquiry officer felt that both parties were bound by their stipulation, and accepted Dr. Weiner's opinion into the record over counsel's objection, pointing out that Dr. Weiner had been agreed upon by both parties as arbiter. A good statement on the effect of a stipulation is available in *Matter of A——*, 4 I. & N. Dec. 378, 384 (C.O., May 10, 1951), wherein it was concluded that the decision as to whether or not the parties are bound by a stipulation rests with the court, and that the court may, in its discretion, set aside a stipulation on numerous grounds, such as fraud, undue influence, collusion, mistake, false statement innocently made, inadvertence or improvidence in making the stipulation (Wigmore on *Evidence*, vol. IX (3rd ed.), sec. 2590). Since these are administrative proceedings, and since citizenship is a precious right, we would not permit anyone to stipulate away his citizenship, if we believed that the record supported a finding of United States citizenship. In the present case the effect of the stipulation is unimportant, because the report of Dr. Weiner is admissible, in any event. Obtaining Dr. Weiner's opinion was a satisfactory solution to the impasse existing at the close of the June 16th hearing. Dr. Weiner's certifications have been accepted by us in a number of cases, and he has been named in other similar proceedings as the ultimate authority on the subject.

The Supplemental Report of the American Medical Association referred to the subject of the qualifications of experts as "a difficult and unsolved problem requiring serious study." It was found necessary in New York City to set up a special panel for this purpose. When blood tests were commenced in New York in 1953, persons to be tested were permitted to choose their own doctors for this purpose. Following complaints of inaccuracy of test results and overcharging, it was discovered that the judges of the Court of Special Sessions, after consultation with the New York Academy of Medicine, had approved a panel of six doctors to conduct blood tests in paternity proceedings before the court. The Immigration and Naturalization Service decided to follow the same procedure and to request the person whose blood was to be tested to choose one of the doctors from this same panel. The panel at that time included Dr. Alexander Weiner, Dr. Philip Levine, and Dr. Sussman.

This is not the first case in which we have had certified an exclusion of paternity based on Rh tests alone, although the others are

all unpublished cases. In unreported *Matter of W——W——Y——*, A–10236058, blood tests were performed by Dr. Leon Sussman, New York, and he certified on January 26, 1954, that the tests demonstrated that it was impossible for respondent to be the offspring of the two persons claimed to be his parents, inasmuch as this child had a blood factor, rh", which he must have inherited from one of his parents, and as neither of the claimed parents had this blood factor, parentage could be excluded. In *L——S——Y——*, A 7873112, unreported (May 10, 1951), Dr. Israel Davidsohn, Chicago, found an exclusion based on the hr' factor. Later, following a blood test of the mother, he found a triple exclusion, based also on the N and rh" factors. Dr. Davidsohn was a member of the Committee of the American Medical Association which wrote the report on blood-grouping tests in 1952, which evidences no hesitation about using Rh-Hr tests for these purposes. In unreported *Matter of L——S——L——*, A–10292624, Dr. Sussman (in a report dated December 22, 1954) certified an exclusion of paternity based on the Rh test alone.

It is important in these cases to be able to rely on the Rh tests. It is possible for a person seeking a purchaser for a previously established "immigration slot" to match the blood groups and types of a candidate to those of the alleged father and mother, particularly if the alleged father and mother fall in the common groups and types, as in this case. Here we have an O father and an A mother. They can have either O or A children and this covers approximately 87 percent of the population. According to the MN typing we have an MN father and MN mother. They can have M, N, or MN children, and this is 100 percent of the population . Therefore, in the instant case the A-B-O tests are of limited value, and the MN tests are useless. However, with Rh tests added to O-A-B and M-N tests, blood matching becomes much more difficult.

Even with the use of Rh tests it is not possible to solve all cases of doubtful parentage. In a report of the Committee on Medicolegal Problems, American Medical Association, *1952* (p. 12), the Committee stated, "When a man is falsely accused of paternity, he has better than a 50 percent chance of being exonerated by the combined use of the A-B-O, M-N, and Rh-Hr tests, while more than 90 percent of cases of interchange of infants can be solved by such tests." The factor rh" is the factor which respondent has which his parents do not have. We note that the Supplemental Report of the American Medical Association Committee, *1957*, mentions that the factor rh" occurs in less than .5 percent of the population. When the claimant possesses a relatively unusual blood factor, blood matching becomes most difficult.

The special inquiry officer denied the request of counsel to offer the testimony of respondent's alleged father, holding that counsel

was bound by his stipulation that there was no issue in the case but the interpretation to be given the blood-grouping tests. We feel that the special inquiry officer's denial of this request was unnecessary, but does not constitute prejudicial error sufficient to require reopening of the record. The alleged father's testimony probably would not have lengthened the record unduly. But neither could it influence our decision, which is bound by the test results. In the past six years we have held repeatedly that blood-test evidence is *conclusive*, when it is satisfactorily established that the tests have been conducted by competent and experienced persons and where the tests conclusively establish the impossibility of the claimed relationship. *Matter of L——F——F——*, 5 I. & N. Dec. 149 (1953); *Matter of W——K——S—— and W——P——S——*, 5 I. & N. Dec. 232 (1953); *Matter of D——W——O—— and D——W——H——*, 5 I. & N. Dec. 351, 356 (1953, 1954); *Matter of L——C——S——*, 6 I. & N. Dec. 212 (1954). These decisions have been sustained in the courts for the most part.[1] When the courts have found citizenship in spite of blood tests demonstrating non-existence of the claimed relationship, it has been for a procedural defect (*Dulles v. Quan Yoke Fong*, 237 F. 2d 496 (C.A. 9, 1956)); or for a failure of the Government to establish the qualifications of the technician (*Chin Wing Gwong v. Dulles*, 139 F. Supp. 116 (D.C.R.I., 1956)).

Counsel complains that he was not permitted to cross-examine Dr. Weiner, and therefore should not be bound by Dr. Weiner's certification. Counsel had two blood-test experts for examination and cross-examination. Examination of experts in these cases has gone largely to the matter of the accuracy of the testing procedure, proper identification of the parties (to eliminate the possibility of substitution), adequate supervision of laboratory workers, and the general acceptance of blood-testing procedure and results for medical and legal purposes. Cross-examination would serve no purpose here, because all parties conceded Dr. Weiner's qualifications and agreed to an acceptance of his interpretation. Until Dr. Weiner's determination was unfavorable to respondent, counsel was willing to submit the issue of the true meaning of the test results to him.

Counsel protests that in *Matter of D——W——O—— and D——W——H——*, 5 I. & N. Dec. 351, at page 361, Dr. Weiner is quoted

---

[1] *United States ex rel. Dong Wing Ott v. Shaughnessy*, 220 F.2d 537, 245 F.2d 875, reaff. 247 F.2d 769 (C.A. 2, 1955–1957); *United States ex rel. Lee Kum Hoy, et al. v. Shaughnessy*, 115 F. Supp. 302, 123 F. Supp. 674 (D.C.N.Y., 1953–1955), 237 F.2d 307 (C.A. 2, 1956), 352 U.S. 966; *United States ex rel. Lee Kum Hoy v. Murff*, 355 U.S. 169; *Lue Chow Kon v. Brownell*, 122 F. Supp. 370, 220 F.2d 187 (C.A. 2, 1955), 146 F. Supp. 3, 245 F.2d 874 (C.A. 2, 1957); *Jew Jock Koon v. Dulles*, 139 F. Supp. 205 (S.D. Texas, 1955); *Get v. Dulles*, 154 F. Supp. 577 (E.D.N.Y., 1957); *Wong Fuey Ying v. Dulles*, 137 F. Supp. 470 (D.C. Mass., 1956); *Leu Moon Cheung v. Rogers*, (D.C. Calif., November 12, 1958).

by us as having said that for the purposes of testifying in legal proceedings he prefers not to rely on the conclusions drawn from tests made by other persons but prefers to make his own tests. Dr. Weiner's letter, exhibit 3 in this record, states that he prefers to conduct the tests himself, but where, as in the instant case, the test results are consistent and only the interpretation is at issue, he is willing to make an interpretation. We fail to see any ground here for a valid objection.

As counsel points out, the Court of Appeals for the Ninth Circuit has held that where the Immigration Service has admitted a claimant as a citizen the burden necessary to overcome the prior admitting decisions falls on the Government. *Lee Hon Lung* v. *Dulles*, 261 F.2d 719 (C.A. 9, 1958). The Ninth Circuit also held in *Et Ming Ng* v. *Brownell*, 258 F.2d 304 (C.A. 9, 1958), that the trial court did not abuse its discretion in determining (among other findings) that the blood tests were reliable and "should be given great weight."

To recapitulate: It is our conclusion that blood-test evidence presented here, consisting of the test results which are consistent and uncontroverted, and interpreted by an unimpeachable expert to establish exclusion of paternity, must be accepted by us. Clearly, Dr. Steiner does not agree with the American Medical Association Committee Reports of 1952 and 1957, but evidently he stands alone in his opinion that the blood factor rh" is too controversial to serve as a basis for an exclusion of paternity. The record does not establish Dr. Steiner as a recognized authority in the field. The writings referred to by him and counsel do not support his view. On the contrary, they support the view of Dr. Ortega, Dr. Weiner, and other authorities. The warnings and exceptions set forth in the American Medical Association Subcommittee reports refer to blood factors other than the rh" factor present here. Any errors committed in the hearing were not prejudicial errors sufficient to require reopening and rehearing. The blood tests constitute clear and convincing evidence that the respondent is not the son of the alleged father. Therefore, he is not a United States citizen. The appeal will be dismissed.

**Order:** It is ordered that the appeal be and is hereby dismissed.